WESTCHESTER FIRE V. ADMIRAL

(comment: 1)

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-01-227-CV

WESTCHESTER FIRE INSURANCE COMPANY APPELLANT

V.

ADMIRAL INSURANCE COMPANY APPELLEE

------------

FROM THE 48TH 
DISTRICT COURT OF TARRANT COUNTY

------------

OPINION ON REHEARING EN BANC

------------

Introduction

After en banc reconsideration and oral argument granted on appellee Admiral Insurance Company's (Admiral) motion for rehearing, we withdraw our prior opinion and judgment dated June 26, 2003 and substitute the following.  
See
 
Tex. R. App. P.
 49.1, 49.3, 49.7.

This case involves a 
Stowers
 action by an excess insurance carrier—the insured’s equitable subrogee—against the insured’s primary carrier for the negligent failure to settle an insurance claim within policy limits.  
See G.A. Stowers Furniture Co. v. Am. Indem. Co.
, 15 S.W.2d 544, 547 (Tex. Comm’n App. 1929, holding approved).  Appellant Westchester Fire Insurance Company (Westchester), the excess insurance carrier, challenges the trial court’s directed verdict for Admiral, the primary carrier, and the partial summary judgment upon which it was based.  We reverse the partial summary judgment in part, and reverse the directed verdict, and remand the case for trial.

Background

In 1994 PeopleCare Heritage Western Hills, Inc. (PeopleCare), the owner of Heritage Western Hills Nursing Home, had a primary policy of professional medical liability insurance with Admiral with limits of $1,000,000 per occurrence and an excess policy with Westchester with limits of $10,000,000 per occurrence.  Beulah Cagle was a patient at Heritage Western Hills.  In December 1994, Beulah and her daughter Lola Cagle sued PeopleCare for negligence, gross negligence, fraud, and violations of the Texas Deceptive Trade Practices Act (DTPA) arising out of PeopleCare’s treatment of Beulah from January through May 1994.  
See
 
Tex. Bus. & Com. Code Ann. 
§§ 17.01-.854 (Vernon 2002 & Supp. 2004-05).

After a bench trial, the trial court found that PeopleCare was negligent and grossly negligent in its treatment of Beulah and that it knowingly misrepresented the nature of Beulah’s injuries to Lola.  In findings of fact and conclusions of law, the trial court found that Beulah was entitled to compensatory damages, plus prejudgment interest, and that Lola was entitled to mental anguish damages, treble damages, attorneys’ fees, and prejudgment interest under the DTPA.  The compensatory damages awarded to the Cagles exceeded Admiral’s policy limits.  The trial court then scheduled a hearing on exemplary damages.
(footnote: 1)  Before the hearing, PeopleCare settled the Cagles’ suit for an amount exceeding the Cagles’ compensatory damages, with Admiral tendering its policy limits, less defense costs and PeopleCare’s deductible, and Westchester contributing the remainder.

Westchester then filed suit against (a) Admiral, alleging, among other things,
(footnote: 2) that Admiral negligently failed to settle the Cagles’ claims against PeopleCare within the limits of the primary insurance policy, and (b) Gardere & Wynne, L.L.P., the law firm that represented PeopleCare in the Cagle suit, for negligence in defending the suit.  Before trial, the trial court granted Admiral a rule 166a partial summary judgment, holding that 

insurance coverage for punitive damages, now and at the time in question, violates the public policy of the State of Texas.  Accordingly, coverage for punitive damages under the Admiral insurance policy is void. . . . [T]his court [also] finds that the award of damages and attorneys’ fees for knowing misrepresentation under the DTPA were not covered by the Admiral insurance policy.

Since Westchester Fire’s 
Stowers
 recovery, if any, only extends to claims that were within the scope of the Admiral policy’s coverage, its recovery is limited to [Beulah] and Lola Cagle’s actual damages. 

Tex. R. Civ. P.
 166a.  Thus, the court held that Westchester’s recovery of damages from Admiral, if any, would be limited to the amount of the Cagles’ compensatory damages that exceeded Admiral’s settlement contribution.
(footnote: 3)
 Before Admiral completed its case-in-chief, Westchester settled with Gardere & Wynne for an amount greater than the amount by which the Cagles’ compensatory damages exceeded Admiral’s settlement contribution.  Accordingly, on Admiral’s motion, the trial court granted Admiral a directed verdict on the ground that Admiral was entitled to a credit in the amount of Gardere & Wynne’s settlement with Westchester, and the amount of the credit exceeded the damages Westchester could recover from Admiral.  
See
 
Tex. Civ. Prac. & Rem. Code Ann. 
§§ 33.012, 33.014 (Vernon 1997).

Issue Presented

In a single point on appeal, Westchester challenges the directed verdict on the ground that the trial court erred in granting the partial summary judgment for Admiral that limited the amount of damages Westchester could recover from Admiral to compensatory damages because Westchester contends punitive damages were covered under Admiral’s policy at the time the Cagle case was settled.
(footnote: 4)  Westchester does not challenge the directed verdict independently of the partial summary judgment; therefore, in reviewing Westchester’s arguments on appeal, we will address only whether the trial court erred in granting partial summary judgment on Westchester’s 
Stowers
 claim.  Likewise, Westchester does not challenge the directed verdict to the extent that it denied Westchester recovery from Admiral for amounts attributable to treble damages and attorneys’ fees awarded to Lola Cagle for PeopleCare’s deceptive trade practices violations on the basis that those damages were not within coverage of the Admiral policy.  Consequently, we do not address whether the partial summary judgment was proper as to those damages.

Westchester contends that the trial court erroneously relied on a federal case construing Texas law in determining that insurance coverage for punitive damages at the time the Cagle cause of action arose or was settled was void as against public policy.  In addition, Westchester claims the trial court erred in not relying on several Texas court of appeals cases holding that punitive damages were insurable in Texas at the time the Cagle cause of action arose or when the case settled.  Westchester further claims that the trial court erroneously relied upon the “volunteer doctrine” in granting the partial summary judgment, averring that this case turns upon whether in 1995 Westchester had a good faith, reasonable belief that punitive damages were insurable in Texas at the time the Cagles’ cause of action arose or when the case settled.

Standard of Review

Questions of law are appropriate matters for summary judgment.  
Rhone-Poulenc, Inc. v. Steel, 
997 S.W.2d 217, 222 (Tex. 1999).  A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff’s cause of action cannot be established.  
Elliott-Williams Co. v. Diaz
, 9 S.W.3d 801, 803 (Tex. 1999).  When reviewing a summary judgment granted on specific grounds, this court can affirm the summary judgment only if the ground on which the trial court granted relief is meritorious.  
Cincinnati Life Ins. Co. v. Cates
, 927 S.W.2d 623, 625-26 (Tex. 1996).  However, if a party preserves other grounds presented in the summary judgment motion that were not ruled on by the trial court, a court of appeals must also consider any other grounds that the trial court did not rule on.  
Id
. at 626.  To preserve these grounds, the party must raise them in the summary judgment proceeding and present them in an issue or cross-point on appeal.  
Id. 
at 625-26
.

Volunteer Doctrine

The motion for partial summary judgment that was granted in Admiral’s favor did not raise Westchester’s voluntariness as a challenge to Westchester’s right to be equitably subrogated to PeopleCare.  And nowhere in the partial summary judgment does the trial court state that Westchester’s payment of the settlement funds was voluntary.  In addition, before filing the motion for partial summary judgment upon which the trial court’s directed verdict was based, Admiral filed a separate motion for partial summary judgment that specifically challenged Westchester’s right to equitable subrogation based on the volunteer doctrine.  The record does not contain any order granting or denying this motion, but an entry on the trial court’s docket sheet indicates the following: “Admiral’s MSJ - denied because fact question on volunteer payment (reasonable belief rule).”  Moreover, the trial judge stated that the basis for the directed verdict was his prior ruling that Admiral’s policy did not provide coverage for either punitive damages or Lola’s DTPA damages; he did not say the directed verdict was based on the volunteer doctrine.  Thus, it appears that the trial court denied summary judgment on that ground, and Admiral concedes this in its brief. 

We address the voluntariness issue only because it was raised and ruled on at trial and because Westchester has discussed it on appeal and at oral argument on rehearing en banc.

Westchester contends that the trial court’s partial summary judgment is incorrect because it was erroneously based on the volunteer doctrine.  Relying on 
Keck, Mahin & Cate v. National Union Fire Insurance Co., PA
, 20 S.W.3d 692 (Tex. 2000), Westchester contends that in 1995 it had a reasonable, good faith belief that insurance coverage for punitive damages did not violate public policy and that it had no choice but to settle the portion of the Cagle claim attributable to punitive damages, regardless of whether punitive damages were actually covered under its policy and Admiral’s policy at that time.  Thus Westchester argues that it should not be precluded from recovering from Admiral damages attributable to amounts Westchester paid to settle the portion of the Cagle claim related to punitive damages.  Admiral responds that Westchester’s 
Keck
 argument was not the basis for the partial summary judgment it obtained and is not dispositive of this appeal. 

The volunteer argument in the 
Keck
 case was asserted as a bar to equitable subrogation.  
Id
. at 702.  A Dictionary of Modern Legal Usage defines “subrogate” as “to put (a person) in the place of, or substitute (him) for, another in respect of a right or claim.”  
A Dictionary of Modern Legal Usage
 525 (1987).  The two key elements of equitable subrogation are 1) that the party on whose behalf the claimant discharged a debt was primarily liable on the debt and 2) that the claimant paid the debt involuntarily.  
Argonaut Ins. Co. v. Allstate Ins. Co.
, 869 S.W.2d 537, 542 (Tex. App.—Corpus Christi 1993, writ denied).  Thus, one who has involuntarily discharged a debt on behalf of another who is primarily liable for that debt is entitled to pursue any right or claim the debtor would have against a third party in relation to the debt.  But to enforce such a right or claim, the subrogee must first prove the debtor’s (and thus, the subrogee’s) entitlement to recover on the right or claim.  
See
 
Am. Centennial Ins. Co. v. Canal Ins. Co.
, 843 S.W.2d 480, 483-85 (Tex. 1992); 68 
Tex. Jur. 3d Subrogation
 § 35 (1989) (“One who is entitled to subrogation stands in the shoes of the creditor whose rights he or she claims, and can enforce every right that was available to the creditor. . . . [b]ut he or she can enforce only such rights as the creditor could enforce.”).  Therefore, the issue of voluntariness is relevant only to a party’s 
standing
 to bring a cause of action as a subrogee.  
Drilltec Tech., Inc. v. Remp
, 64 S.W.3d 212, 216 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  Once this issue is decided in favor of the party’s ability to bring suit, it has no relevance to the proof required for the party to actually recover on its cause of action. 

In 
Keck
, the supreme court held that an excess insurer’s settlement of a case was not voluntary—even though the excess carrier’s own policy did not provide coverage—because at the time of the settlement, the excess carrier made the payment in good faith and reasonably believed the payment was necessary for its protection.  
Keck
, 20 S.W.3d at 702–03.  In light of this “reasonable belief” rule and the supreme court’s liberal interpretation of it, the court held that

[i]f an insurance company’s [excess insurer’s] right to subrogation could be challenged by the wrongdoer [e.g., attorneys, primary insurer, etc.] on the grounds that the [excess] policy did not actually provide coverage, it would necessarily be in the company’s interest to litigate all questionable claims with its insured.  The effect of ignoring the reasonable belief rule, therefore, is to discourage insurance companies from paying or settling disputed claims and thereby force insureds more often into litigation with their insurers.  

Id
. at 703 (quoting 1 
Allan D. Windt, Insurance Claims & Disputes 
§ 10.10, at 150-51 (3rd ed. 1995)).  Thus, in 
Keck
, because the excess carrier’s settlement payment was involuntary, the excess carrier was equitably subrogated to any claims its insured could assert against a wrongdoer; that is, it could 
bring
 the malpractice action against its insured’s trial counsel.  
See id. 
 Likewise, in this case, Westchester, the excess insurer, was subrogated to any rights PeopleCare could assert against its primary carrier, Admiral, so long as its payment on the underlying claim was involuntary.  Further, under Texas law, an excess insurer’s payment to settle a suit against the insured is presumptively involuntary for subrogation purposes.  
Id. 
at 702.

Under the 
Keck
 analysis, if Westchester in good faith reasonably believed at the time of settlement that its payment was necessary for its protection, then its settlement was not voluntary, and it was entitled to equitable subrogation, i.e., entitled to maintain a cause of action against Admiral in the place of Admiral’s insured, PeopleCare.  
See id. 
at 702-03; 
Argonaut
, 869 S.W.2d at 542.  Whether Westchester reasonably believed its payment was necessary, and, therefore, whether its payment was involuntary, is a question that relates to its 
right
 of subrogation.  Even if Westchester was entitled to 
bring a Stowers 
cause of action against Admiral as PeopleCare’s equitable subrogee, it still had to 
prove
 the elements of the cause of action, just as the insurer in 
Keck
 still had to prove the insured’s malpractice action against the insured’s trial counsel.

Westchester, in PeopleCare’s place, pursued its 
Stowers
 action against Admiral.  
See Am. Centennial
, 843 S.W.2d at 483.  As PeopleCare’s equitable subrogee, Westchester’s ability to recover damages on PeopleCare’s 
Stowers
 claim was limited to PeopleCare’s ability to recover damages as Admiral’s insured.  
See id
. at 483; 
Nat’l Union Fire Ins. Co. v. Ins. Co. of N. Am.
, 955 S.W.2d 120, 134 (Tex. App.—Houston [14th Dist.] 1997), 
aff’d sub nom., Keck, 
20 S.W.3d at 704.  The 
Stowers
 duty to settle is not activated unless three prerequisites are met:  (1) the claim against the insured is within the
 
scope of coverage, (2) the claimant has made a settlement demand that is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment.  
Am. Physicians Ins. Exch. v. Garcia
, 876 S.W.2d 842, 849 (Tex. 1994).  “[A]n insurer has no duty to settle a claim that is not covered under its policy.”  
Id
. at 848.  

Thus, determining that Westchester’s payment of settlement funds on behalf of PeopleCare was involuntary—entitling it to be subrogated to PeopleCare’s 
Stowers
 cause of action against Admiral—only resolves Westchester’s 
right
 to pursue a 
Stowers
 claim; it would still have to prove its 
Stowers
 cause of action against Admiral.  Whether or not the 
insured
 (or its equitable subrogee) has a reasonable, good faith belief that a policy provides coverage for a claim is not key to a 
Stowers
 cause of action.  The issue is whether the duty to settle was breached.  Even if Westchester is correct in contending that its payment of settlement funds was involuntary, the “involuntariness” of its payment does not resolve the issue of whether Admiral breached its duty to PeopleCare to settle all covered claims asserted against PeopleCare.  Thus, we agree with Admiral that the volunteer issue is not dispositive of this appeal.

Insurance Coverage for Punitive Damages
 

Admiral’s Motion for Partial Summary Judgment contends that, as a matter of law, any portion of Westchester’s 
Stowers
 claim attributable to punitive damages must fail because (1) such damages are excluded from coverage by Admiral’s policy language and (2) contracting for insurance coverage for punitive damages violates Texas’s public policy.  Thus, Admiral argues Westchester cannot satisfy the first element of a 
Stowers
 claim:  that the damages it seeks against Admiral are within the scope of coverage of Admiral’s policy.  And if punitive damages are not covered under Admiral’s primary policy, Westchester may not recover any excess judgment attributable to such punitive damages in its 
Stowers
 action.  
The trial court’s partial summary judgment in favor of Admiral on punitive damages was based upon its determination that insurance coverage for punitive damages is against public policy.  The court did not agree with Admiral that the policy language itself excluded coverage.
(footnote: 5)
 Policy Language

On appeal Admiral again argues that punitive damages are not covered by its policy because they are based on conduct that results in expected or intended injuries, and the policy provides coverage only for injuries that are “neither expected nor intended by the insured.”  Admiral claims that grossly negligent behavior can never be an accidental error or omission.  However, as mentioned above, the trial court expressly rejected this ground for partial summary judgment.

The commercial general liability (CGL) portion of Admiral’s policy covered “those sums which the Insured shall become legally obligated to pay as damages because of . . . bodily injury . . . caused by an occurrence.”  The policy defined “occurrence” as “an accident . . . which results in bodily injury . . . neither expected nor intended from the standpoint of the Insured.”  However, the policy also contained a portion entitled “Coverage O-Hospital Professional Liability,” which stated that

Admiral will pay on behalf of the insured those sums which the insured shall become legally obligated to pay as damages because of bodily injury to any person arising out of the rendering of or failure to render, during the policy period, the following professional services:

. . . Nursing treatment to such person including the furnishing of food or beverages in connection therewith.

Thus, while the CGL portion of the policy limits coverage to bodily injury arising out of an occurrence, the Hospital Professional Liability portion does not.  It provides coverage for nursing home care and does not limit recovery to only an “accident” or “occurrence.”

The trial court in the underlying Cagle case found that PeopleCare’s failure to provide care for Beulah (e.g., leaving her in a urine-soaked bed) was grossly negligent.  Thus, any damages, including punitive damages, that the trial court could have awarded to Beulah based on such failure to render care would have been covered under the language of the Hospital Professional Liability portion of PeopleCare’s policy.  Consequently, the trial court properly denied partial summary judgment on the ground that Admiral’s policy language precluded coverage for punitive damages.

Admiral contends that the Fifth Circuit case 
St. Paul Fire & Marine Insurance Co.
 requires a different result.  
St. Paul Fire & Marine Ins., Co. v. Convalescent Servs., Inc.
, 193 F.3d 340, 343 (5th Cir. 1999) (holding under Texas law that insured could not recover from insurer portion of excess judgment attributable to punitive damages when policy specifically excluded coverage for punitive damages).  However, in the 
St. Paul 
case, unlike this case, the insurer, rather than settling with the plaintiff for amounts not covered by its policy, reserved its coverage dispute and filed suit for declaratory relief seeking a determination that it was not liable for payment of a punitive damages award against its insured.  
Id.
 at 341.  Additionally the value of the covered claim in 
St. Paul 
was well below policy limits as opposed to the claim in this case.  
Id.
 at 343.  More importantly, the primary policy in 
St. Paul specifically excluded coverage for punitive damages
, and the federal court explicitly relied on this exclusion in making its 
Erie
 guess on Texas law.  
Id
. at 345 (citing 
Erie R.R. v. Tompkins, 
304 U.S. 64, 58 S. Ct. 817 (1938)).  We therefore cannot agree that 
St. Paul 
is controlling over Admiral’s policy because of the differences in the policies’ language.

Further, there is no evidence in the record that Admiral assumed the defense of the Cagles’ claims under a reservation of rights or that Admiral ever challenged coverage for any of the Cagles’ claims until after Westchester had settled the Cagles’ suit and brought this action.  Also, the evidence showed that Admiral was aware of its insured’s exposure to punitive damages and, therefore, its own.  In a letter from Admiral to Westchester, Admiral stated, “Regarding evaluation of punitive exposure, punitive damages are not excluded from our policy.  As the case is venued in Texas, we are aware of the danger of punitive damages and are making every effort to settle this matter.”  From this, we can only conclude that Admiral believed its policy on PeopleCare covered both the negligence and gross negligence claims as it considered and made settlement offers and that the trial court properly denied Admiral’s motion for partial summary judgment on this basis.

Public Policy

Generally, the legislature determines public policy.  
FM Props. Operating Co. v. City of Austin
, 22 S.W.3d 868, 873 (Tex. 2000) (holding legislative power is the power to make rules and determine public policy).  Courts look to state statutes and judicial decisions to determine public policy.  
Stubbs v. Ortega
, 977 S.W.2d 718, 722 (Tex. App.—Fort Worth 1998, pet. denied).  The supreme court has long held that “contracts against public policy are void and will not be carried into effect by courts of justice.”  
James v. Fulcrod
, 5 Tex. 512, 520 (1851).  A contract is against public policy if it is illegal or injurious to the public good.  
See
 14 
Tex. Jur
. 3D 
Contracts
 § 143 (1997).

Our supreme court is highly deferential to the legislature when determining this state’s public policy, stating that 

[p]ublic policy . . . is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law.

Tex. Commerce Bank, N.A. v. Grizzle
, 96 S.W.3d 240, 250 (Tex. 2002) (quoting 
Lawrence v. CDB Servs., Inc.
, 44 S.W.3d 544, 553 (Tex. 2001)). 

A court should not decide a public policy question without first evaluating the contract language.  
Tex. Farmers Ins. Co. v. Murphy
, 996 S.W.2d 873, 878 (Tex. 1999).  Only if a contractual provision violates public policy should a court not enforce it.  
Alma Invs., Inc. v. Bahia Mar Co-Owners Assn
., 999 S.W.2d 820, 823-24 (Tex. App.—Corpus Christi 1999, pet. denied).  The Texas Supreme Court has applied the public policy doctrine found in the Restatement of Contracts (Second).  
Id
. (citing 
Beck v. Beck
, 814 S.W.2d 745, 748-49 (Tex. 1991), 
cert. denied
, 498 U.S. 1048 (1991); 
DeSantis v. Wackenhut Corp.
, 793 S.W.2d 670, 681-82 (Tex. 1990) (op. on reh’g)).  Section 178 provides that “a promise or term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.”  
Id. 
at 824 (quoting 
Restatement (Second) of Contracts 
§ 178(1) (1981)).  
Accordingly, when faced with a need to determine whether a contract term violates this state’s public policy, we should take into account the following factors:

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

Id. 
(quoting 
Restatement (Second) of Contracts 
§ 178(3) (1981)).

At the time of this suit between Westchester and Admiral, neither the Texas Legislature nor the Supreme Court of Texas had addressed whether insurance coverage for punitive damage awards against nursing homes violates Texas’s public policy.  However, a federal district court in Texas had issued its 
Hartford v. Powell 
opinion, upon which the trial court relied.  
Hartford Cas. Ins. Co. v. Powell
, 19 F. Supp. 2d 678, 696 (N.D. Tex. 1998) (holding that any insurance contract that prevents a punitive damage award from having its punishment effect would be held void in Texas ).  That court made an “
Erie
 guess” that the Texas Supreme Court would hold that, at least in the context of third-party coverage for automobile insurance claims, insurance coverage for punitive damages is void as against public policy.  Westchester claims that the trial judge erred in relying on that opinion in ruling on Admiral’s partial summary judgment motion.

The record shows that in a letter to trial counsel, the trial judge stated that he “paid particular attention to” the 
Powell
 case; however, he did not state that he relied on it as authority.  We disagree with Westchester’s contention that a Texas trial court may not consider a federal case construing Texas law.  Although these cases are not binding as precedent on Texas state courts, they may be instructive on state law issues, and state courts are not prohibited from considering the federal courts’ reasoning in cases determining matters of Texas law.  
See Davenport v. Garcia
, 834 S.W.2d 4, 20 (Tex. 1992) (orig. proceeding).  

Because neither the legislature nor the supreme court has addressed the public policy implications of insurance coverage for punitive damage awards against nursing homes, we engage in a similar analysis as the 
Powell
 court.  
See Alma Invs., Inc.
, 999 S.W.2d at 824.  Several Texas courts, including this court, have held that the language in a standard form liability policy providing coverage for “sums” or “all sums” an insured becomes required to pay as a result of bodily injury or property damage covers punitive damages if not otherwise excluded.  
See Manriquez v. Mid-Century Ins. Co.
, 779 S.W.2d 482, 484 (Tex. App.—El Paso 1989, writ denied) (automobile policy), 
disapproved in part on other grounds, Trinity Universal Ins. Co. v. Cowan
, 945 S.W.2d 819, 823 (Tex. 1997); 
Am. Home Assurance Co. v. Safway Steel Prods. Co.
, 743 S.W.2d 693, 704-05 (Tex. App.—Austin 1987, writ denied) (umbrella liability policies); 
Home Indem. Co. v. Tyler
, 522 S.W.2d 594, 597 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ ref’d n.r.e.) (uninsured motorist coverage), 
overruled by
 
Milligan v. State Farm Mut. Auto. Ins. Co.
, 940 S.W.2d 228, 232 (Tex. App.—Houston [14th Dist.] 1997, writ denied)
; Dairyland County Mut. Ins. Co. v. Wallgren
, 477 S.W.2d 341, 342-43 (Tex. Civ. App.—Fort Worth 1972, writ ref’d n.r.e.) (automobile policy).  

This court in 
Dairyland
 also considered whether insurance coverage for punitive damages was against Texas’s public policy, concluding that coverage did not violate public policy for the sole reason that the policy language in that case had been “prescribed and approved” by the Insurance Commission, now the Texas Department of Insurance (TDI).  477 S.W.2d at 342.  This court did not, however, discuss the underlying purposes of punitive damages awards, such as punishing the wrongdoer and preventing similar behavior in the future, in its public policy discussion.  
See Tyler
, 522 S.W.2d at 597.  The supreme court has since held that “policy provisions, even if TDI-approved, are invalid if they are inconsistent with express statutory requirements or purposes.”  
Mid-Century Ins. Co. v. Kidd
, 997 S.W.2d 265, 271-72 (Tex. 1999).

The 
Safway
 court addressed the public policy issue, holding that a corporation should be able to insure itself against the gross conduct of its agents.  743 S.W.2d at 703-04.  The court focused on the dual objectives of punitive damages:  punishment and deterrence.  
Id.
 at 704.  The court recognized the reasoning of federal courts and other state courts that have held insurance coverage for punitive damages is against public policy.  
Id
.  But the court determined that denying such coverage does not necessarily promote the punishment of corporate offenders, stating,

An insurance company that deliberately enters into a contract to provide coverage against liability for punitive damages is free to charge additional premiums for such coverage, so as to provide a separate fund for the express purpose of paying such judgments without “punishing” either the insurance company or society.  The insurance company is also free to deny coverage of punitive damages altogether.  In the case of an established corporation, it is important to note that its inability to obtain such coverage will inevitably be passed on to the consumers of its products--who are also innocent.

Id
.  In addition, the court concluded that holding such damages void as against public policy would not deter wrongdoers because at the time, Texas law did not allow juries to consider “the defendant's wealth, resources, or insurance coverage when assessing . . . damages [of any kind].”  
Id
.  

After the 
Safway
 case, Texas’s punitive damages laws began to undergo significant change.  In 1987, the Texas legislature codified the law regarding exemplary damages.  
See
 Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44-46 (amended 1989, 1995, 1997 & 2001) (current version at 
Tex. Civ. Prac. & Rem. Code Ann
. §§ 41.001-.013).  The next year, the supreme court held that evidence of a defendant’s net worth is relevant to the issue of punitive damages and, therefore, discoverable. 
 Lunsford v. Morris
, 746 S.W.2d 471, 471-72 (Tex. 1988) (orig. proceeding), 
disapproved of on other grounds, Walker v. Packer
, 827 S.W.2d 833, 841-42 (Tex. 1992).  In doing so, the court relied on two of the purposes of punitive damages:  punishing the wrongdoer and deterring the same or similar future conduct.  
Id
. 

In June 1994, the Supreme Court of Texas issued its landmark opinion in 
Transportation Insurance Co. v. Moriel
.  879 S.W.2d 10 (Tex. 1994).  As part of its analysis in that case, the court stated that “[t]he legal justification for punitive damages is similar to that for criminal punishment” and that “punitive damages are levied for the public purpose of punishment and deterrence.”  
Id
. at 16-17.  While Texas law before 
Moriel
 held that the general purpose of punitive damages was to punish the wrongdoer, 
see Smith v. Sherwood
, 2 Tex. 461, 463-64 (1847), 
Flanagan v. Womack
, 54 Tex. 45, 50 (1880), and 
Cotton v. Cooper
, 209 S.W. 135, 138 (Tex. Comm’n App. 1919, judgm’t adopted), other cases suggested that punitive damages might also serve a compensatory function, 
see Traweek v. Martin-Brown Co.
, 79 Tex. 460, 14 S.W. 564, 565-66 (1890), 
Hofer v. Lavender
, 679 S.W.2d 470, 474-75 (Tex. 1984), and 
Qualicare of East Texas, Inc. v. Runnels
, 863 S.W.2d 220, 224 (Tex. App.—Eastland 1993, writ dism’d).  
Powell
, 19 F. Supp. 2d at 683.  The 
Moriel
 court clarified the purpose of punitive damages in Texas, stating that “[o]ur duty in civil cases . . ., like the duty of criminal courts, 
is to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment
.”  
Moriel
, 879 S.W.2d at 17 (emphasis added).  However, 
Moriel
 also recognized that the civil practice and remedies code, which governs the imposition of punitive damages, at that time defined exemplary damages as “any damages awarded as an example to others, as a penalty, or by way of punishment.  ‘Exemplary damages’ includes punitive damages.”  
See
 Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44 (amended 1995).

In response to 
Moriel
, the legislature revised the statutory provisions regarding exemplary damages during the 1995 legislative session.  
See
 Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 108-13.  Importantly, the definition of exemplary damages was revised.  The 1995 legislation deleted the words “as an example to others,” leaving the definition of exemplary damages as “any damages awarded as a penalty or by way of punishment.”  
See
 Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109.  However, the 1995 amendments apply only to a cause of action accruing on or after September 1, 1995 and are thus inapplicable here.  Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108, 113.

In addition, beginning in 1994, Texas courts of appeals began to re-examine whether insurance coverage for punitive damages is void as against public policy in the context of uninsured and underinsured motorist claims.  Since then, several courts have held that punitive damages are uninsurable in these contexts.  
Milligan, 
940 S.W.2d at 232; 
State Farm Mut. Auto. Ins. Co. v. Shaffer
, 888 S.W.2d 146, 149 (Tex. App.—Houston [1st Dist.] 1994, writ denied); 
Vanderlinden v. USAA Prop. & Cas. Ins. Co.
, 885 S.W.2d 239, 242 (Tex. App.—Texarkana 1994, writ denied).  The 
Milligan
 court held that the objectives of punishment and deterrence cannot be accomplished in an uninsured motorist claim because the wrongdoer is not even involved.  940 S.W.2d at 231.  The court went on to distinguish the 
Safway
 case on the ground that “the policy considerations which permit an insurer to obligate itself for punitive damages based on the conduct of its insured are different than those where uninsured motorist coverage is at issue.”  
Id
. at 232 (quoting 
Safway’s
 holding that “[a]s long as insurance companies are willing, for a price, to provide protection against liability for punitive damages to corporations they deem ‘good risks,’ . . . we see no reason why these contracts should not be enforced”).

Courts holding that insurance coverage for punitive damages violates public policy generally do so on the theory that wrongdoers should not be shielded from the consequences of their acts.  
See
 
Lee R. Russ, Couch on Insurance 3d
 § 101:29, at 101-99 (2001).
(footnote: 6)  As noted by the 
Powell
 court, this view was described by the Fifth Circuit in 
Northwestern National Casualty Co. v. McNulty
:

Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct.  It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy.  The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.  

The policy considerations in a state where . . . punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong.  If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose.  Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole.  And there is no point in punishing the insurance company; it has done no wrong.  In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers.  Society would then be punishing itself for the wrong committed by the insured. 

307 F.2d 432, 440-41 (5th Cir. 1962), 
superseded in part by
 
VA. Code Ann
. § 38.2-227 (Michie, Westlaw through 2004 Special Sess. II).  One commentator has suggested that “[t]o the extent this rationale is based on the need to deter future wrongful conduct, it underestimates the impact that a large payment by an insurer would have on the insured’s ability to obtain future insurance coverage, and the amount of premiums that would have to be paid.”  
Russ
, 
supra
, § 101:29, at 101-99.  In other words, the insured wrongdoer has not only paid premiums for the coverage, but will likely pay greater premiums after an insurer has paid a claim or will not be able to obtain insurance at all.  

Further, as the 
Powell
 court noted, a competing public policy is the right of parties to enter into contracts freely. 
 Powell
, 19 F. Supp. 2d at 693.  The  Supreme Court of Texas has held that “contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.” 
Missouri, K. & T. Ry. v. Carter
, 95 Tex. 461, 68 S.W. 159, 164 (1902); 
see also Lawrence
, 44 S.W.3d at 553 (noting that the Texas Supreme Court has “long recognized a strong public policy in favor of preserving the freedom of contract” and that courts “must exercise judicial restraint in deciding whether to hold arm’s-length contracts void on public policy grounds”).  In addition, at least one trial court has characterized Texas’s public policy regarding insurance as follows:  “Texas has a strong public policy of enforcing its insurance policies and requiring insurers to step up to the plate with respect to their insureds and properly pay. . . .  We have very strong public policies about not letting insurance companies back off of their obligations.”  
Am. Intern. Specialty Lines Ins. Co. v. Triton Energy Ltd.
, 52 S.W.3d 337, 341-42 (Tex. App.—Dallas 2001, pet. dism'd w.o.j.) (affirming trial court’s order enjoining California declaratory judgment action to determine whether insurance policy provided coverage for punitive damages).

Texas’s public policy regarding coverage for punitive damages under professional medical liability policies in particular is found in the insurance code.  
See
 
Tex. Ins. Code Ann. 
art. 5.15-1 (Vernon 1981 & Supp. 2004-05).  In 1977 the Texas legislature enacted article 5.15-1, section 8 of the insurance code, which provided that “[n]o policy of medical professional liability insurance issued to or renewed for a health care provider or physician in this state may include coverage for punitive damages that may be assessed against the health care provider or physician.”  Medical Liability and Insurance Improvement Act, 65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2056 (amended 1987, 1997 & 2001) (current version at 
Tex. Ins. Code Ann.
 art. 5.15-1, § 8).  “Health care provider” was defined as,

any person, partnership, professional association, corporation, facility, or institution  licensed or chartered by the State of Texas to provide health care as a registered nurse, hospital, dentist, podiatrist, chiropractor, optometrist, blood bank that is a nonprofit corporation chartered to operate a blood bank and which is accredited by the American Association of Blood Banks, or 
not-for-profit nursing home
, or an officer, employee, or agent of any of them acting in the course and scope of his employment.

Id
. at 2055 (amended 2001) (current version at 
Tex. Ins. Code Ann
. art. 5.15-1, § 2) 
(emphasis added).  The 1977 legislation was passed in order to alleviate a medical insurance crisis and its stated purpose was to:

improve and modify the system by which health care liability claims are determined in order to: 

. . . . 

(2) decrease the cost of [health care] claims and assure that awards are rationally related to actual damages;

. . . . 

(4) make available to physicians, hospitals, and other health care providers protection against potential liability through the insurance mechanism at reasonably affordable rates;

. . . .

(6) make certain modifications in the medical, insurance, and legal systems in order to determine whether or not there will be an effect on rates charged by insurers for medical professional liability insurance; and

(7) make certain modifications to the liability laws as they relate to health care liability claims 
only and with an intention of the legislature to not extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law
. 

Medical Liability and Insurance Improvement Act, 65th Leg., R.S., ch. 817, § 1.02(b), 1977 Tex. Gen. Laws 2039, 2040-41 (emphasis added).  Another purpose was to penalize and deter the intentional or grossly negligent wrongdoer.  
See Horizon/CMS Healthcare Corp. v. Auld
, 34 S.W.3d 887, 895 (Tex. 2000) (citing 
Texas Medical Professional Liability Study Commission, Final Report to the 65th Legislature 25
 (Dec. 1976) and 
Hearings on Tex. H.B. 722 Before the House Comm. on State Affairs
, 65th Leg., R.S. (Feb. 14, 1977) (Rep. Davis’s statement in reference to the proposed prohibition in the Insurance Code that “it’s against social policy to permit someone to insure against their own gross negligence or a willful injury of another”)).

In 1987, the legislature amended section 8 to provide that “the [insurance] board may approve an endorsement form that provides for coverage for punitive damages to be used on a policy of medical professional liability insurance issued to a 
hospital
.”  Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 7.01, 1987 Tex. Gen. Laws 1, 36 (amended 1997 & 2001) (emphasis added).  The legislature extended the ability to obtain an endorsement for punitive damages to not-for-profit nursing homes in 1997.  
See
 Act of May 21, 1997, 75th Leg., R.S., ch. 746, § 1, 1997 Tex. Gen. Laws 2451, 2451 (amended 2001).  

It was not until 2001 that the legislature added 
for-profit nursing homes
 to the list of entities prohibited from obtaining coverage for punitive damages 
under a primary insurance policy
, but at the same time the legislature 
included them
 in the list of entities that could obtain a 
specific endorsement for such coverage
.  
See
 Act of May 27, 2001, 77th Leg., R.S., ch. 1284, §§ 5.01, 5.02, 2001 Tex. Gen. Laws 3083, 3085.  The 2001 amendments were intended as “temporary solutions” to “facilitate the efficient recovery of both for-profit and not-for-profit private long-term care facilities,” which the legislature acknowledged were in crisis.  
See
 Act of May 27, 2001, 77th Leg., R.S., ch. 1284, § 1.02(a), (c), 2001 Tex. Gen. Laws 3083, 3083.  Furthermore, the introduction to the 2001 amendments states that,

[w]ith respect to the legal concepts incorporated in the measures contained in this Act, the legislature does not intend for these concepts to be applied outside the realm of long-term care.  Because the application of the measures contained in this Act in relation to these legal concepts is temporary and because of the extraordinary complexity and uniqueness of the crisis facing nursing homes, 
these measures should not be construed as the legislature’s interpretation of the current law applicable to these legal concepts.  In enacting the extraordinary measures contained in this Act, the legislature specifically rejects any suggestion that these measures represent solutions that are appropriate for any area involving liability insurance, insurance practices, or medical care other than long-term care facilities
.

Act of May 27, 2001, 77th Leg., R.S., ch. 1284, § 1.02(d), 2001 Tex. Gen. Laws 3083, 3083 (emphasis added).  Thus, it is clear that before the effective date of the 2001 amendments, a for-profit nursing home, such as PeopleCare, was not prohibited by the legislature from obtaining insurance coverage for punitive damages awards under a professional medical liability insurance policy, and after the 2001 amendments, it is permitted to do so if the nursing home specifically obtains an endorsement for such coverage.  
See
 
Tex. Ins. Code Ann. 
art. 5.15-1, § 8.

Admiral also contends that because 
Moriel
 “heightened [the] level of culpability required to support an award of punitive damages,” and the trend for Texas courts since 
Moriel
 has been to hold that punitive damages are uninsurable, allowing insurance coverage for punitive damages under Admiral’s policy contravenes public policy. 

We agree that public policy is subject to change; it is not static.  
See Pawson v. State
, 865 S.W.2d 36, 39 n.6 (Tex. Crim. App. 1993); 
Featherlite Bldg. Prods. Corp. v. Constructors Unlimited, Inc.
, 714 S.W.2d 68, 70 (Tex. App.—Houston [14th Dist.] 1986, writ ref’d n.r.e.); 
Kennedy v. Laird
, 503 S.W.2d 664, 665 (Tex. Civ. App.—Houston [1st Dist.] 1973, no writ).  The 
Powell
 opinion aptly traces the evolution of this state’s public policy regarding the purposes of punitive damages and the standards for imposing them.  19 F. Supp. 2d at 682-85, 687-91, 693-96.  However, the supreme court has also clearly stated that an agreement does not violate public policy if it does not contravene a positive statute or well-established rule of law.  
See, e.g.
, 
Grizzle
, 96 S.W.3d at 250. 

Further, contrary to Admiral’s reliance on 
Powell
, and its argument that 
Powell’s
 “
Erie
” conclusion that Texas’s current public policy is against the insurability of punitive damages, we are not faced with the issue of current insurability but with a policy originally issued in 1993, an occurrence in 1994, and a suit and settlement in 1995.  At all relevant times in the Cagle suit—the effective dates of the Admiral policy,
(footnote: 7) the time during which PeopleCare both treated and failed to treat Beulah, and when the case was filed, negotiated, and tried—the legislature authorized the imposition of exemplary damages as “an example to others.”  Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44 (defining exemplary damages as “any damages awarded as an example to others, as a penalty, 
or
 by way of punishment” (emphasis added)), 45 (providing that chapter 41 of the civil practice and remedies code governed the imposition of exemplary damages in a personal injury case) (both amended in 1995).

Additionally, 
Moriel
 did not address the insurability of punitive damages; insurance coverage was not at issue in that case.  The legislative change to the definition of exemplary damages (as being solely for penalty or punishment) did not apply to causes of action accruing before September 1, 1995.  
See
 Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108, 113.  Therefore, when the Cagle case was decided—even though PeopleCare’s gross negligence was determined under the 
Moriel
 standard—the trial judge could have awarded punitive damages for the sole purpose of making an example of PeopleCare, rather than punishing PeopleCare for its grossly negligent treatment of Beulah.

Whether or not the party against whom punitive damages are imposed actually pays (or its insurance company pays) such an award is irrelevant when the purpose of the award is to make an example of the party.  It is the mere fact that the damages are assessed that sets the example to the public and other similarly situated parties.  Thus, the trial court’s imposition of punitive damages would not have violated one of the express statutory purposes then in effect as to the Cagle case.  In addition, the insurance code listed numerous entities that were prohibited from obtaining such coverage, but for-profit nursing homes were not listed.  
See
 Medical Liability and Insurance Improvement Act, 65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2056.  Consequently, we cannot say that coverage for such damages under Admiral’s policy was void as against public policy at that time.

Further, we decline to address Admiral’s argument that insurability of punitive damages is currently against public policy even though Westchester agreed with that proposition on rehearing.  The present viability of insured punitive damages is not before us.  If we were to decide the case on that basis, we would be deciding it on grounds not relevant to the outcome (because, as we have already explained, the pertinent inquiry is whether Admiral’s policy covered the Cagles’ claim for punitive damages when the claim was pending) and without the benefit of arguments from a party representing the interests of an insured (or the insured public of this state).
(footnote: 8)  We are prohibited from rendering advisory opinions and have no jurisdiction to do so.  
Tex. Const.
 art. II, § 1; 
Brown v. Todd
, 53 S.W.3d 297, 302 (Tex. 2001); 
Valley Baptist Med. Ctr. v. Gonzalez
, 33 S.W.3d 821, 822 (Tex. 2000).  Therefore, we decline to address whether insurance coverage for punitive damages currently violates this state’s public policy.
(footnote: 9)
 Lastly, we must address the assertions of the concurring and dissenting  opinion.  Because Westchester, as PeopleCare’s equitable subrogee, stands in the shoes of its insured, it may bring any cause of action against Admiral that PeopleCare could have brought.  Westchester obviously has “standing” to bring a 
Stowers
 cause of action against Admiral.  Contrary to what the concurring and dissenting opinion says, Admiral’s standing is irrelevant because it is not the claimant in this 
Stowers
 cause of action.  Likewise, Westchester’s 
Stowers
 action presents a real, live justiciable controversy, not an abstract question of law.  The concurring and dissenting opinion confuses Admiral’s standing with Admiral’s failure to raise its public policy scope of coverage issue sooner.  That is a question of estoppel, not standing.  And since Westchester never claimed Admiral was estopped from challenging the 
Stowers
 scope of coverage prong, it is barred from raising it here.

Because we have determined that coverage for punitive damages under Admiral’s professional liability policy would not have violated one of the express statutory definitions of exemplary damages during the period relevant to Westchester’s 
Stowers
 claim, and based on our review and consideration of judicial decisions regarding punitive damages, we hold that insurance coverage under Admiral’s policy for the punitive damages awarded to the Cagles and against PeopleCare was not void as against the public policy of Texas at that time.

Because insurance coverage for punitive damages under Admiral’s policy was not void as against public policy at the relevant time, the trial court erred in determining that the Admiral policy did not provide coverage for punitive damages; therefore, Westchester’s recovery should not have been limited to only those amounts attributable to the compensatory damages exceeding Admiral’s policy limits. 

Based on the foregoing, we conclude that the trial court erred in granting Admiral partial summary judgment on the public policy issue.  Because Westchester’s recovery should have been reduced only by Lola’s treble damages and related attorneys’ fees (an amount equal to one third of the treble damages), Admiral’s election of the settlement credit did not preclude Westchester from recovering damages from Admiral that were attributable to a potential punitive damages award.  Therefore, the trial court erred in granting a directed verdict for Admiral on that basis.

Other Grounds for Directed Verdict

Admiral contends that even if the trial court erred in granting a directed verdict based on its partial summary judgment, the directed verdict was proper for other reasons.  A directed verdict is proper only under the following limited circumstances as a matter of law:  (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent, or (2) when the evidence is insufficient to raise a fact issue that must be established before the opponent is entitled to judgment.  
Compare
 
Tex. R. Civ. P
. 268 
with
 
Tex. R. Civ. P. 
301; 
see Prudential Ins. Co. v. Fin. Review Servs., Inc.
, 29 S.W.3d 74, 77 (Tex. 2000);
 Boswell v. Farm & Home Sav. Ass'n
, 894 S.W.2d 761, 768 (Tex. App.—Fort Worth 1994, writ denied).  In reviewing a directed verdict, we must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences.  
Szczepanik v. First S. Trust Co.,
 883 S.W.2d 648, 649 (Tex. 1994); 
White v. S.W. Bell Tel. Co.
, 651 S.W.2d 260, 262 (Tex. 1983); 
Heinsohn v. Trans-Con Adjustment Bureau
, 939 S.W.2d 793, 795 (Tex. App.—Fort Worth 1997, writ denied).  Further, we must determine if there is any conflicting evidence of probative value that raises a material fact issue.  
See
 
Szczepanik
, 883 S.W.2d at 649; 
White
, 651 S.W.2d at 262.  If there is any such evidence on any theory of recovery, a determination of that issue is for the jury.  
See Szczepanik
, 883 S.W.2d at 649; 
Cano v. N. Tex. Nephrology Assoc., P.A.
, 99 S.W.3d 330, 339 (Tex. App.—Fort Worth 2003, no pet.).

An appellate court must affirm a trial court’s directed verdict, regardless of the grounds asserted by the movant or upon which the trial court granted the directed verdict, if the record establishes any ground that entitles the movant to judgment as a matter of law.  
Crescendo Invs., Inc. v. Brice
, 61 S.W.3d 465, 472 (Tex. App.—San Antonio 2001, pet. denied);
 Gonzales v. Willis
, 995 S.W.2d 729, 740 (Tex. App.—San Antonio 1999, no pet.) (op. on reh'g); 
Smith v. Guthrie
, 557 S.W.2d 163, 164-65 (Tex. Civ. App.—Fort Worth 1977, writ ref’d n.r.e.); 
Granato v. Bravo
, 498 S.W.2d 499, 502-03 (Tex. Civ. App.—San Antonio 1973, no writ).  A directed verdict for a defendant is proper in two situations: when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff’s right of recovery and when a plaintiff admits or the evidence conclusively establishes a defense to the plaintiff’s cause of action.  
Prudential Ins. Co.
, 29 S.W.3d at 77; 
Johnson v. Scott Fetzer Co.
, 124 S.W.3d 257, 262 (Tex. App.—Fort Worth 2003, pet. denied); 
Cano
, 99 S.W.3d at 338.   Because the review of a directed verdict is essentially a legal sufficiency review and we must affirm a directed verdict even if on different grounds than the trial court’s partial summary judgment, we must consider Admiral’s other theories that might support the verdict. 

No Demand Within Policy Limits

Admiral contends that, regardless of the propriety of the partial summary judgment on which the directed verdict was based, the directed verdict was proper because Westchester presented no evidence that the Cagles made a settlement demand that triggered Admiral’s duty to settle under 
Stowers
.  An insurer has no duty to settle a third-party claim unless it has received a demand within its policy limits. 
 Garcia
, 876 S.W.2d at 849.  A demand above policy limits, even though reasonable, does not trigger the 
Stowers
 duty to settle.  
Id
.

The evidence in this case shows that Kimberly Robinson, counsel for PeopleCare, and Dusty Fillmore III, counsel for the Cagles, first discussed settlement of the case in February 1995 after a pretrial conference.  At that time, Fillmore told Robinson that the Cagles would be seeking PeopleCare’s policy limits.  Later that month, Robinson sent Fillmore a “dec page” for the Admiral policy, which showed that Admiral’s policy limits were inclusive of costs and expenses; in other words, the policy was a “burning” or “eroding”
(footnote: 10) policy in which the policy limits are diminished by defense costs and expenses.  Fillmore testified that he was unsure then whether the dec page was for the entity that actually owned Heritage Western Hills Nursing Home because several PeopleCare entities were listed on the dec page.  Fillmore orally communicated to Robinson on at least one other occasion that the Cagles were seeking PeopleCare’s policy limits.  A letter Robinson wrote Admiral on April 25, 1995 indicates that Fillmore was “[b]asically . . . willing to settle for the full policy limits.”

Robinson testified at trial that she did not construe any of these conversations to be settlement offers because “he [Fillmore] really didn’t approach me with the topic like you would a normal settlement demand.  In addition, his comments were along the lines of, well, I can’t believe that you don’t think this is a $1,000,000 case. . . . Those are the types of discussions that we had.”  Beverly Godbey, lead counsel for PeopleCare, also testified that Robinson told her

that on several occasions she [Robinson] had talked to [Fillmore] about settlement and just about his view of the case, and very consistently he would express a very high opinion about his cases and say I think this is a policy limits case.

. . . . 

Not in terms of it being an actual offer that we could accept, but just as – as the way plaintiff’s lawyers sometimes talk about their cases.

. . . .

Every time he talked about it, he talked about it in the future, we’re going to be looking for this, we’re going to be seeking this, we’re going to be asking for this, and this was the same way he was conveying it to [Robinson], as I remember, not as something that he would presently take but something that he was going to do in the future.

  

On July 19, 1995, Fillmore wrote Robinson a letter in which he asked “what amount of insurance is left, out of the aggregate, on the primary policy.”  Fillmore testified at trial that he was trying to confirm what insurance was still available because of the concern that PeopleCare-affiliated entities other than Heritage Western Hills may have been covered under the policy and the possibility that the aggregate may have been depleted by other claims.  Robert Schlegel, the president of PeopleCare Centers of Texas, Inc., testified at his deposition in July 1995 that “most of the coverage was still available under the policy.”  Robinson sent Fillmore a letter in response stating that “unless I am mistaken, I recall Mr. Schlegel testifying that the entire $2 million aggregate on the primary insurance policy was still in place.  Indeed, that is the information received from Admiral Insurance Company.  In any event, I am sure that you will find that the insurance policies in place are sufficient to cover Ms. Cagle’s claims.”  Fillmore testified that he thought this meant the full $1,000,000 limits of the primary policy were available for the Cagles’ claims.  

Fillmore sent Robinson two letters dated August 1, 1995, in which he stated that the Cagles’ settlement demand would exceed the primary policy’s coverage limits.  For this reason, he expressed concern that Westchester be notified about the mediation and have a representative present.  On August 9, 1995, Fillmore sent Robinson a written settlement proposal, which stated, “[W]e are willing, 
at this time
, to settle this case for the policy limits of the primary insurance policy:  $1,000,000.00.  I trust that you will apprise the excess carrier of the fact that this case can be settled, 
at this time
, within the limits of the primary insurance policy.”  Fillmore testified that he “made the demand 
for the policy limits of the primary insurance company
, which at that time we understood to be $1,000,000.” [Emphasis added]. 

In discussing the demand letter at trial, Fillmore stated, “We made a $1,000,000 demand and then they pop up later and say, oh, by the way, there wasn’t $1,000,000 available, so you did not make a—an appropriate Stowers [sic] demand.”  According to Fillmore, the demand assumes that “the amount of the primary policy is $1,000,000 and that the full 1,000,000 is available.”  However, in response to cross-examination asking if the demand was conditioned upon the policy limits being $1,000,000, Fillmore stated that

what I’m setting out is basically that we are willing to settle for the primary insurance policy limits, colon, and that sets out what they have been represented to us to be, $1,000,000.

And then the next sentence tells them that we are willing to [settle] within the limits of the insurance policy.

So, if you mean it’s conditioned on it being a million, and if it’s not a million, then we wouldn’t be settling, I don’t believe that is correct.

Fillmore testified that he thought the policy limits were $1,000,000 because “that’s what had been represented to us to be available for the client.”  He further testified that he felt he had “basically been tricked into not making a Stowers [sic] demand or not making a demand within their policy limits.” 

On August 15, 1995, Admiral sent PeopleCare a letter advising that under the terms of the policy PeopleCare’s written consent was required in order to settle the claim.  PeopleCare responded in writing on August 16, consenting to settlement “if it can be negotiated within [the] policy limit.”

The case went to mediation on August 16, 1995.  H. Dustin Fillmore II (Fillmore II), Fillmore’s father and law partner, attended the mediation.  According to Fillmore II, his son made an opening demand “right at $1,000,000 or whatever the coverage was.”  He testified that he and Fillmore were aware of the eroding nature of the policy when they attended the mediation, but that

[t]he problem was [he and Fillmore] were getting subsequent information telling [them] that the coverage was 1,000,000.  So, that’s why the demand was couched the way it was.  If it’s – If you got 1,000,000, we want that.  That’s our demand.  If it’s not $1,000,000, if it’s eroded down to 950 or 990 or whatever, then that’s what we want.

Fillmore II also testified that

[o]ur demand at the mediation was, if it – if you have $1,000,000, that’s what we’ll settle the case for.  If it’s less than 1,000,000, if it’s depreciated some amount, what we want is the – what’s left on the primary policy of insurance.  That’s what we’re willing to settle the case for.

 . . . .

[T]hose were the terms in which . . . the demand was communicated.

If you’ve got $1,000,000 coverage, we want the $1,000,000 to settle the claim.  If you don’t have $1,000,000, if it has been depreciated, that coverage has gone down some, we’ll take that.  Whatever you’re telling us – 

You still have $1,000,000.  So we’ll take that.  If you don’t have it, then we’ll take what’s left.
(footnote: 11)

Fillmore, on the other hand, testified that “we didn’t have any discussions at the mediation about the defense cost being subtracted from the policy” and “[h]ad we known that at the time, we would have made a demand within [whatever] was available at that time, but we didn’t.”  In a subsequent letter to Godbey, Fillmore stated, “
We made no settlement demand of a million dollars at mediation; we simply asked the Defendant to make an offer and see how close to one million dollars it could come in order to settle this case
.”  [Emphasis added.]

At the mediation, PeopleCare made an opening offer of $40,000.
(footnote: 12)  Fillmore informed the mediator that unless PeopleCare made an offer in the $500,000 range, there was no reason to continue mediating.  The mediator returned, saying that PeopleCare would not increase its offer and would never make a $500,000 offer in the case.  According to Godbey, she and Fillmore II met personally outside the presence of the mediator and 

talked about the fact that we couldn’t even pay the $1,000,000 even if we wanted to pay the $1,000,000 because this was a wasting policy, and he said he understand [sic] that.  He said that didn’t make any difference.  What he was out there to tell me was if we would come up to $500,000, then only under that circumstance would they come off $1,000,000.

. . . .

I believe what I ultimately did was tell him that I did not have authority to settle the case there but that I would be happy to talk with my client and see if there’s anything else we can do, and he basically closed the mediation by saying, well, if you don’t have $1,000,000, then you’re going to need to get up just as close to 1,000,0000 as you can come, or words to that effect.

. . . .

They never came off their $1,000,000 demand.

According to Godbey, the Fillmores “knew the policy limits were not $1,000,000, and . . . didn’t want to come off $1,000,000.”  Thus, the mediation ended without a settlement.

In an August 17, 1995 letter to Admiral, Myrna Schlegel, another officer of PeopleCare, wrote, “Also note that the demand for settlement is currently within the basic insured amount.  Please attempt to get this account settled as soon as possible.”

The record contains another handwritten note made by Guest dated August 22, 1995, in which he states, “$1M settlement demand in.”  In an August 24, 1995 letter to Robinson, Guest writes, “This will confirm receipt by copy of your August 10, 1995 letter to Jane Hill of Admiral inclusive of the plaintiff’s formal settlement proposal document wherein a $1,000,000 demand is extended.”

In a September 21, 1995 letter to Fillmore, Godbey offered to settle the case for a cash payment of $146,000 or an annuity with either a lifetime income of $2,207 per month with five years guaranteed or a guaranteed income of $2,776 per month for five years only. That same day, Fillmore wrote back to Godbey, stating that based on new information in the case, the demand for the Cagles’ claims had increased to $1,750,000 for Beulah and $150,000 for Lola.  The letter also states, “You were given an opportunity to settle this case within the primary policy limits at mediation.” 

On September 28, 1995, Godbey wrote a letter to Fillmore indicating that there had never been a demand for policy limits in the case.  She stated that  “[b]oth from our discussions at the mediation and from our interrogatory answers, you know that defense costs are subtracted from the policy limits in this case.”  Fillmore responded in a letter dated the same day, stating that the “only information [he had received] concerning available insurance coverage under the primary policy of insurance” was a copy of the policy indicating an aggregate of $2,000,000, Mr. Schlegel’s deposition testimony, and the July 1995 letter from Robinson.  He said further that the Cagles’ demands had increased because of costs and new information.  The Cagles never lowered their demands before trial.

Gary Beck, an insurance expert hired by Westchester, testified that the settlement demand in the August 9 letter was a demand within policy limits.  He based his opinion on “the letter, 25 years[‘] experience in looking at Stowers [sic] demand letters, [and] knowing how a plaintiff lawyer Stowerizes an insurance company. “ According to Beck, the letter was a demand within the eroding limits of the policy because

I think he used the magic words policy limits.  “We will settle for policy limits.”  I think that’s a direct quote.

So, in my mind, if you’re a claims adjuster looking at that, that means policy limits as they may exist from time to time.

Now, I think the distinction that is being made here by the other side is that because there was the statement made, $1,000,000, that’s the stated limit on the face of the policy for the per occurrence limits, but I think the demand for policy limits gets around that, if that’s a quibbling point.

Ricky Brantley, the attorney appointed as Beulah’s guardian ad litem in the Cagle case, testified that “[b]ased on what [he] had looked at in the file, it was [his] opinion that there had been a demand or an offer to settle the case for Admiral Insurance’s policy limits.”  His opinion was based on “the communications, the settlement demand that was sent at the time of the mediation, the letters that were written about what coverage was in effect . . . [and] answers to interrogatories.”

We hold that, viewed under the proper standard, there is more than a scintilla of evidence to raise a fact issue regarding whether the Cagles made a settlement demand within policy limits.  Therefore, we conclude that a directed verdict would not have been proper on this ground.  

Ordinarily Prudent Insurer Would Not Accept Settlement Offers

Admiral further contends that the directed verdict should be affirmed because an ordinarily prudent insurer would not have accepted the terms of the Cagles’ premediation $1 million settlement demand.  According to Admiral, an ordinarily prudent insurer would only accept a demand within policy limits, would not settle without its insured’s consent when the policy requires it to first obtain consent, and would not accept an opening, premediation settlement demand without attempting to negotiate a lower settlement amount.

We have already determined that a fact issue exists on whether Admiral received a policy limits demand from the Cagles.  Admiral next claims that it never had the opportunity to settle within policy limits because it did not have its insured’s consent to do so.  According to Admiral, it did not have notice of Myrna Schlegel’s consent to settle within policy limits until after the mediation, and at the mediation, Mrs. Schlegel would not allow Godbey and Robinson to offer more than $40,000. 

Godbey testified that it was her understanding before the mediation that the Schlegels had not given Admiral written authorization to settle the case and that the issue would need to be discussed at mediation.  Godbey said that at mediation, Mrs. Schlegel would not authorize an opening demand of more than $40,000.  Godbey said she had no authority from Mrs. Schlegel to make any further offer, and there was nothing she and Robinson could do to change Mrs. Schlegel’s mind.  Godbey did not learn about Mrs. Schlegel’s letter authorizing a settlement within policy limits until after the mediation.

The fax identification information on the top of Mrs. Schlegel’s letter consenting to a settlement “within [PeopleCare’s] insurance policy limit” indicates it was sent from the “SCHLEGEL OFFICE” on “AUG . . . 99" at 11:58.  However, the information does not indicate whether it was 11:58 a.m. or p.m.  The date of the letter is August 16, 1995, but Mrs. Schlegel did not know when the letter was sent.  Mrs. Schlegel testified by deposition that she did not control the negotiations at mediation; the insurance company did.  She said that she told the insurance company “in [her] letters” that she wanted to settle for more than $40,000.  Fillmore testified that the initial decision after the mediation was that the Cagles would not accept a policy limits settlement, but that this decision was not “hard and fast,” and it was not until some point after mediation that a policy limits settlement became unacceptable.

We hold that Admiral failed to conclusively prove that it did not have an opportunity to settle the claim after receiving PeopleCare’s consent.  Admiral did not attempt to obtain its insured’s consent to settlement until the day before mediation even though the parties had been discussing mediation since February 1995.  In addition, Fillmore’s testimony indicates it may have been possible for Admiral to settle the case for policy limits even after the mediation.  Thus, we conclude that a directed verdict was not proper on this ground.

Finally, Admiral contends that an ordinarily prudent insurer would not have accepted an opening demand for its full policy limits without first attempting to negotiate a lower settlement amount.  Admiral quotes the following testimony from Ray Chester, one of Westchester’s experts, averring that it shows why an ordinarily prudent insurer would not have accepted an opening offer of policy limits:

There was [a] $1,000,000 primary insurance policy.  The plaintiff’s lawyer had indicated that he thought it was a policy limits case, that he would settle for the primary insurance limits, but then he also agreed to mediate it, which is a very clear signal that he will take less than 1,000,000 because if you are firm on your 1,000,000 and you ---

All you do is you send a 
Stowers
 letter, and there is reason to mediate because it’s a million or nothing or I’m going to trial -- if you sent -- If you make a $1,000,000 demand or policy limit demand, as was made in this case, and then you agree to mediate or indicate you are willing to settle it for less . . . than policy limits.

However, the same expert testified that he thought the value of the case exceeded $1,000,000 from the beginning.  Another of Westchester’s experts testified that it would not have been unreasonable for Admiral to settle for $1,000,000 at the mediation.  Accordingly, we hold that Admiral failed to conclusively prove that an ordinarily prudent insurer would not have accepted the Cagles’ policy limits demand; therefore, Admiral was not entitled to a directed verdict on this ground either.

Because there remain factual issues as to whether an offer within policy limits was tendered and whether an ordinarily reasonable person would accept the offer, there are no other bases upon which to affirm the directed verdict. 

Conclusion

Having determined under the specific facts of this case that public policy at the time the Cagle case was decided did not preclude coverage under Admiral’s policy for amounts attributable to punitive damages, that the Admiral policy and professional malpractice endorsement did not exclude punitive damages from coverage, and that the evidence is sufficient to raise a fact issue regarding whether Admiral received a proper 
Stowers
 demand and whether an ordinarily prudent insurer would have settled the case for policy limits, we reverse the part of the trial court’s partial summary judgment determining that public policy at the time the Cagle case was tried and settled precluded coverage under Admiral’s policy for punitive damages and excluding from Westchester’s potential damages recovery the amount of Westchester’s settlement contribution attributable to punitive damages on Beulah’s claim.
  We affirm the part of the trial court’s partial motion for summary judgment excluding DTPA treble damages and related attorneys’ fees from any potential damages award as unchallenged.  Because Admiral’s settlement credit is less than the amount of Westchester’s potential recovery (i.e., the portion of Westchester’s settlement contribution attributable to the Cagles’ compensatory damages and punitive damages on Beulah’s claim), we reverse the trial court’s directed verdict in Admiral’s favor
(footnote: 13) and remand the case for a new trial on Westchester’s 
Stowers
 claim.

TERRIE LIVINGSTON

JUSTICE

EN BANC

CAYCE, C.J. filed a concurring and dissenting opinion in which HOLMAN, J. joins.

MCCOY, J. recused

DELIVERED:  December 2, 2004

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-01-227-CV

WESTCHESTER FIRE INSURANCE COMPANY APPELLANT

V.

ADMIRAL INSURANCE COMPANY APPELLEE

------------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

CONCURRING AND DISSENTING OPINION ON REHEARING

------------

I concur with the majority’s holding that gross negligence is a covered claim under the language of Admiral’s insurance contract with PeopleCare, and I agree that the question of whether it is now against public policy to insure punitive damages is not before us.  I dissent, however, to the majority’s advisory opinion holding that it was not against public policy to insure against punitive damages on or before 1995.

To invoke the subject matter jurisdiction of the trial court for the purpose of deciding whether it was against public policy for Admiral to insure PeopleCare’s punitive damages on or before 1995, the party challenging the legality of insuring punitive damages, Admiral, must have standing to assert the complaint.
(footnote: 1)  Standing is implicit in the concept of subject matter jurisdiction and stems from two constitutional limitations on that jurisdiction:  the separation of powers doctrine and the open courts provision.
(footnote: 2)  The separation of powers doctrine prohibits courts from issuing advisory opinions.
(footnote: 3)  The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties.  Rather than remedying an actual or imminent harm, an advisory opinion addresses only a hypothetical injury.
(footnote: 4)  Texas courts have no jurisdiction to render such opinions.
(footnote: 5)
 Standing is also an aspect of the open courts provision of the Texas Constitution, which contemplates access to the courts for those litigants suffering an injury.  Specifically, the open courts provision provides:

All courts shall be open, and every person for an 
injury 
done him, . . . shall have remedy by due course of law.
(footnote: 6)

Thus, there must be an actual, not merely hypothetical or generalized, grievance.
(footnote: 7)
 As a ground for its motion for partial summary judgment, Admiral argued that Westchester is precluded from recovering on its 
Stowers
(footnote: 8) action against Admiral for negligently refusing to settle the Cagles’ gross negligence claim against PeopleCare, because it was against public policy to insure punitive damages at that time.  Admiral contends that punitive damages were uninsurable at that time because the underlying social purpose of punitive damages was, and is, to punish wrongdoers and prevent similar behavior against society in the future—an objective that would be frustrated if wrongdoers were permitted to insure against their own grossly negligent conduct or willful injury to another.  The trial court expressly granted Admiral’s motion on this ground declaring:

[I]nsurance coverage for punitive damages, now and at the time in question, violates the public policy of the State of Texas.  Accordingly, coverage for punitive damages under the Admiral insurance policy is void.

In reversing the trial court’s judgment, a majority of this court has rendered the following pronouncement: 

Whether or not the party against whom punitive damages are imposed actually pays (or its insurance company pays) such an award is irrelevant when the purpose of the award is to make an example of the party.  It is the mere fact that the damages are assessed that sets the example to the public and other similarly situated parties. . . .  In addition, the insurance code listed numerous entities that were prohibited from obtaining such coverage, but for-profit nursing homes were not listed.  Consequently, we cannot say that coverage for such damages under Admiral’s policy was void as against public policy at that time.
(footnote: 9)

I do not believe we have jurisdiction to make this public policy decision because Admiral has no standing in this case to challenge the insurability of punitive damages on public policy grounds.  I, therefore, dissent to this part of the majority’s opinion.

The question decided by the trial court—whether “insurance coverage for punitive damages . . . at the time in question, violates the public policy of the State of Texas”—is an abstract question of law that has no binding effect on either party to this case.  No insured of either insurance company is a party to the case and no party is seeking a judgment that would allow or deny coverage of an insured’s punitive damage award.
(footnote: 10)  Consequently, the trial court’s judgment remedied no actual or imminent harm to the public, or to a party, resulting from the potential coverage or noncoverage of a punitive damage award.  It was, therefore, an advisory judgment which the trial court had no subject matter jurisdiction to render.  

“Our jurisdiction over the merits of an appeal extends no further than that of the court from which the appeal is taken.”
(footnote: 11)  Because the trial court lacked subject matter jurisdiction to decide the hypothetical question of whether insurance coverage for punitive damages violated public policy on or before 1995, so do we.
(footnote: 12)
 The only real issue between the parties to this case is whether Westchester is entitled under 
Stowers
 to recover damages from Admiral for its alleged negligence in refusing to settle a claim covered by the language of Admiral’s insurance contract with PeopleCare.  Whether Admiral violated public policy when it agreed to insure PeopleCare against its own gross negligence is immaterial to Westchester’s right to recover against Admiral under 
Stowers.

The majority misunderstands the nature of the standing problem.  The issue is not whether 
Westchester 
has standing to bring its 
Stowers 
action, as the majority believes, but whether 
Admiral 
has standing to challenge the legality insuring PeopleCare against punitive damages prior to 1995.  Admiral cannot rely on Westchester’s standing to bring a 
Stowers 
action for the separate standing Admiral must have to challenge the legality of insuring PeopleCare’s punitive damages.  Westchester’s 
Stowers
 action may involve a justiciable controversy, but Admiral’s pre-1995 public policy challenge does not. 

Moreover, it is difficult to understand what the majority means by its statement that this opinion “confuses Admiral’s standing with Admiral’s failure to raise its public policy scope of coverage issue sooner.  That is a question of estoppel, not standing.”
(footnote: 13)  This issue, which the majority has raised 
sua sponte
, has no relevance to Admiral’s standing to challenge the insurability of punitive damages.  Standing is a component of subject matter jurisdiction and cannot be waived.
(footnote: 14)  Because Admiral had no standing to challenge the legality of PeopleCare’s insurance contract on pre-1995 public policy grounds, the trial court had no subject matter jurisdiction to decide the issue whether Admiral was estopped from asserting it or not.
(footnote: 15) 

I would hold that gross negligence is a covered claim under the language of Admiral’s insurance contract, and that Westchester, as PeopleCare’s equitable subrogee, is entitled to pursue recovery on its 
Stowers
 action for any excess damages it paid on that claim as a result of Admiral’s negligence.  I would further hold that the trial court erred in rendering summary judgment against Westchester on public policy grounds because Admiral has no standing to challenge the insurability of punitive damages under the facts of this case.  Because the trial court had no subject matter jurisdiction to decide the public policy question, I would vacate and set aside the trial court’s judgment
(footnote: 16) and remand the case for trial on the remainder of Westchester’s 
Stowers
 action against Admiral.

JOHN CAYCE

CHIEF JUSTICE

HOLMAN, J. joins.

DELIVERED: December 2, 2004

FOOTNOTES
1:
The terms exemplary damages and punitive damages are used interchangeably throughout this opinion; however, all references to either refer to damages recoverable under chapter 41 of the civil practice and remedies code.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 §§ 41.001-.013 (Vernon 1997 & Supp. 2004-05).

2:
Westchester alleged several claims against Admiral but tried only the 
Stowers
 claim.

3:
Admiral’s policy limits were reduced by defense costs and a $10,000 deductible.

4:
Westchester does not specifically refer to the partial summary judgment, but rather the court’s previous ruling regarding the insurability of punitive damages.  We construe Westchester’s challenge to the court’s prior ruling as a challenge to the partial summary judgment.  
See
 
Tex. R. App. P.
 38.9.

5:
Again, we do not discuss the court’s ruling on the Cagles’ award of DTPA treble damages and attorneys’ fees because Westchester has not challenged their denial on appeal.

6:
A review of other states’ decisions on this issue shows that

[t]here is considerable authority that liability insurance coverage of an award of punitive damages is generally void as contrary to public policy. . . . [However,] several jurisdictions recognize that there is no public policy concern which ordinarily precludes insuring against liability for punitive damages, so that policy provisions broad enough to include such coverage could be enforced. 

 

Id
.
 §101:29, at 101-100, 101-106 (citations omitted).  In twenty-nine other states, insurance coverage for punitive damages does not violate public policy; however, eight of those states exclude coverage for punitive damages arising out of intentional acts.  
See
 McCullough, Campbell & Lane, 
The Insurability of Punitive Damages, Jurisdictional Analysis
, 
at
 http://www.mcandl.com/puni_
 
states.html (last visited November 22
, 2004); 
see also
 
Russ, 
supra
,
 at 101-99 to 101-109.  Fifteen states hold that insurance coverage for punitive damages is void as against public policy, but eight of those states allow coverage for punitive damages that are imposed as a result of vicarious liability.  
See
 McCullough, Campbell & Lane, 
supra
; 
see also
 
Russ, 
supra
.

7:
Admiral’s policy period was from December 1, 1993 to December 1, 1994.  

8:
We did not receive any amicus briefs in connection with this case.

9:
We note that the partial summary judgment is overly broad in that insurance coverage for punitive damages cannot be void as against public policy in all cases because the legislature has provided that an endorsement is available to certain entities in the context of professional medical liability insurance.  
See
 
Tex. Ins. Code Ann.
 art. 5.15-1, § 8.

10:
Also referred to elsewhere as an “exhausting” or “wasting” limits policy.

11:
A post-trial letter from Michael Knippen, an attorney whom Westchester hired to investigate the claim after the trial judge made his initial ruling on damages, indicates that “[p]laintiff’s counsel indicated recently that the defendants were told at the mediation that the case could be settled for the primary policy regardless of the erosion of its limits.”  
The letter also states, 

Because of Admiral’s exhausting limits . . . Westchester may not argue Admiral could have settled this matter within their limits when the Plaintiff’s made their $1 million demand.  Assuming each policy [Admiral’s and Westchester’s] is given effect as written, the exhausting nature of Admiral’s limits inhibited it from entering into a settlement agreement with the Plaintiff.

A footnote at the end of the quoted language, however, indicates that this evaluation is “[s]ubject to plaintiff’s indications to defense counsel.”

12:
The parties dispute whether Admiral or PeopleCare controlled the mediation offer.  Admiral contends that PeopleCare’s representative would not allow Robinson and Godbey to offer more than $40,000 while Westchester contends that the $40,000 offer was Admiral’s idea.  A handwritten note made by Elijah Guest, who monitored the claim for Westchester
,
 was introduced into evidence at trial.  The note detailed a telephone conference between Guest and Jane Hill, the adjuster handling the claim for Admiral.  Guest’s note indicates that he “advised Hill that counsel’s recent damages/value report indicated . . . that insured would not allow an opening offer above $40K.  Hill said Admiral chose the 40K figure.”  Because we must view the evidence in the light most favorable to Westchester, we assume that Admiral controlled the decision to make offers at the mediation.

13:
Any damages Westchester may recover at trial will be reduced by the amount of Admiral’s settlement credit and Lola’s DTPA treble damages and attorneys’ fees.

1:
Brown v. Todd
, 53 S.W.3d 297, 302 (Tex. 2001)
.  Although Westchester has not raised this issue, standing is a component of subject matter jurisdiction and cannot be waived by the parties.  
Tex. Ass’n of Bus. v. Tex. Air Control Bd.
, 852 S.W.2d 440, 445 (Tex. 1993).

2:
Id. 
at 443
; 
see 
Tex. Const. 
art. II, § 1; 
Tex. Const.
 art. I, § 13.

3:
Brown
, 53 S.W.3d at 302; 
Firemen’s Ins. Co. v. Burch
, 442 S.W.2d 331, 333 (Tex. 1968).  

4:
See Allen v. Wright
, 468 U.S. 737, 751, 104 S. Ct. 3315, 3324 (1984).

5:
Valley Baptist Med. Ctr. v. Gonzalez
, 33 S.W.3d 821, 822 (Tex. 2000).

6:
Tex. Const.
 art. I, § 13 (emphasis supplied).  

7:
Brown
, 53 S.W.3d at 302.

8:
G.A. Stowers Furniture Co. v. Am. Indem. Co.
, 15 S.W.2d 544 (Tex. Comm’n App. 1929, holding approved)
.

9:
Maj. Op. at 35 (citation omitted). 

10:
Admiral has not argued that public policy would be violated by allowing Westchester, as a 
Stowers
 plaintiff, to recover excess on a gross negligence claim, only that it was against public policy to insure punitive damages on or before 1995.

11:
Mobil Oil Corp. v. Shores
, 128 S.W.3d 718, 722 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh’g).  

12:
Id.

13:
Maj. Op. at 37.

14:
Tex. Ass’n of Bus.
, 852 S.W.2d at 445.

15:
The majority’s holding that Westchester is barred from claiming Admiral is estopped from challenging the insurability of punitive damages is yet another advisory ruling by the majority because neither party raised the issue of estoppel.

16:
Mobil Oil Corp.
, 128 S.W.3d at 722 
(holding that if the trial court lacks subject matter jurisdiction, “we only have jurisdiction to set the trial court’s judgment aside”).

COMMENTS AND ANNOTATIONS
Comment 1:
Majority by Justice Livingston; Concurrence/ Dissent by Chief Justice Cayce