COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-117-CV

 

 

ROBERT D. SMITH, CRAIG B. LYON,                                    APPELLANTS

CARL
WALCHSHAUSER, THE FRANKIE R.

PUTNAM,
SR. TRUST, FRANK PUTNAM, 

INDIVIDUALLY,
THE CLEAR CREEK AIR ESTATES

PROPERTY
OWNERS ASSOCIATION, INC., AND

ROBERT
E. ADAMS

 

                                                   V.

 

BENJAMIN F. HUSTON, MARY E. HUSTON,                              APPELLEES

BENJAMIN
E. HUSTON, DIANA A. HUSTON,

THOMAS
WESSIE HUSTON, CRISTY R. HUSTON,

AND
DIANE CRAWFORD

 

                                                 AND

 

BENJAMIN F. HUSTON, MARY E. HUSTON,                 CROSS-APPELLANTS

BENJAMIN
E. HUSTON, DIANA A. HUSTON,

THOMAS
WESSIE HUSTON, AND CRISTY R. 

HUSTON

 

                                                   V.

 

ROBERT D. SMITH, CRAIG B. LYON,                            CROSS-APPELLEES

CARL
WALCHSHAUSER, THE FRANKIE R.

PUTNAM,
SR. TRUST, FRANK PUTNAM, 

INDIVIDUALLY,
THE CLEAR CREEK AIR ESTATES

PROPERTY
OWNERS ASSOCIATION, INC., AND

ROBERT
E. ADAMS

 








 

                                              ------------

 

                    FROM
PROBATE  COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








This appeal involves a
dispute over access to and fees associated with a shared airstrip servicing the
Clear Creek Air Estates subdivision in Sanger, Texas.  In two issues, appellants Robert B. Smith,
Craig B. Lyon, Carl Walchshauser, The Frankie Putnam Sr. Trust, Frank Putnam
individually, Robert Adams (collectively, the lot owners), and the Clear Creek
Air Estates Property Owners Association, Inc. challenge the parts of the trial
court=s judgment (1) awarding breach of contract damages to appellees
Benjamin F. Huston, Mary E. Huston, Benjamin E. Huston, Diana A. Huston, Thomas
Wessie Huston, and Cristy R. Huston,[1]
(2) rendering declaratory judgment allowing the owner of the airstrip to
collect annual fees as set forth in easement agreements giving the lot owners
access to the airstrip, regardless of the reasonableness of those fees and
without giving an accounting, and (3) awarding attorneys= fees to the Hustons under section 38.001 of the civil practice and
remedies code.[2]  Tex.
Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon 1997). 
Appellees bring a cross-appeal in which they challenge the part of the
trial court=s judgment
(1) rendering a declaratory judgment prohibiting the Hustons from denying the
lot owners access to the airstrip if they have not paid all fees due under the
easement agreements and (2) awarding attorneys= fees to the Hustons under section 37.009 of the civil practice and
remedies code.  Id. ' 37.009 (Vernon 1997).  We
affirm.

Background Facts








Appellees Benjamin F. (Ben)
and Mary E. Huston bought 324.625 acres of land in Sanger, Texas in 1978.  They financed their purchase and subsequent
development of the land with loans from First State Bank of Gainesville.  Six years later, in November 1984, they filed
a plat in the Denton County records, which divided the easternmost part of the
property into lots for the purpose of creating a housing development adjacent
to an airstrip located on their remaining undivided acreage.  The development was to be known as Clear
Creek Air Estates.  The platted lots
abutted the east side of the two hundred foot wide airstrip; all the land west
of the airstrip remained undivided acreage. 
Ben and Mary also recorded covenants, conditions, and restrictions
affecting the platted lots.

On July 8, 1985, Ben and Mary
sold Lot 5, Block B.  The conveyance
included a Anonexclusive
easement for aircraft for flight and taxiway purposes along, over and across@ the airstrip, which was described in an exhibit attached to the
deed.  The following language was
included in Exhibit A, immediately following the legal description of the
airstrip:

Such easement is subject to
the following:

(1)
Rules and regulations as established and amended from time to time by the owner
and/or manager of the airport, such airport situated on the 13.008 acre tract
described above, and being known as Ironhead [A]irport;

 

(2)    Grantee has no right to park aircraft or any
other personal property upon said easement;

 

(3)    Grantee has no right to construct buildings
or any other structure upon the easement;

 

(4)    Grantee shall be subject to charge of $200.00 per year for use of
airport; Owner and/or Manager of airport shall have right to increase such
charge at the rate of 10% annually after the year 1985.  Grantee shall pay any such charge within 30
days from date of billing.  








In 1987, Ben and Mary
defaulted on their loans to the bank. 
Instead of accelerating the loans and foreclosing on the property, the
bank allowed them to execute a deed in lieu of foreclosure.  In the deed to the bank, which was recorded
in the Denton County real property records, Ben and Mary conveyed 232.136 acres
from their original 324.625 acre purchase; the conveyance included all the
platted lots east of the airstrip except those that Ben and Mary had already
sold to third parties.  Ben and Mary
reserved to themselves four tracts of the westernmost, undivided acreage,
including the land on which the airstrip is located.  They also agreed to enter into a maintenance
agreement with the bank pursuant to which Ben and Mary would maintain the bank=s land and the airstrip.  

Several years later, the bank
filed suit against Ben and Mary, claiming that Ben and Mary were obligated to
grant the bank and its transferees access to and use of the airstrip.  They eventually entered into a Compromise
Settlement Agreement, which was incorporated into an agreed judgment dated
April 18, 1991.  








As part of the Settlement
Agreement, Ben and Mary and the bank agreed to form the Clear Creek Air Estates
Property Owners=
Association.[3]  The Association was to lease the airstrip
from Ben and Mary for an initial ten year period with an option to renew the
lease for an additional ten years.  The
Settlement Agreement also provided that the Association would enter into a
maintenance agreement with the party of its choice, effective upon expiration
of the maintenance agreement that Ben and Mary and the bank had agreed to in
the deed in lieu of foreclosure.  The
Settlement Agreement further provided that Ben and Mary would continue to
maintain the airstrip pursuant to the maintenance agreement referenced in the deed
in lieu of foreclosure until that maintenance agreement expired.[4]  

The Settlement Agreement set
forth other rights and duties of the Association as well, including the rights
and duties to provide for Arules and regulations concerning the use of the airstrip and
contiguous land,@ to A[e]stablish the terms and conditions for granting use of the airstrip
to members,@ and to join
with the bank, Ben and Mary, or all three whenever necessary Ain the preparation, . . . filing and recording of restrictions
consistent with the existing restrictions@ previously recorded by Ben and Mary on any land abutting the
airstrip.  The Settlement Agreement also
provided for two classes of members in the Association:  those who owned lots adjacent to the airstrip
and those who owned lots that do not abut the airstrip.  








Regarding access to the
airstrip, Ben and Mary and the bank agreed that the bank would pay Ben and Mary
$2,500 cash for an easement allowing Lot 1, Block B access to and use of the
airstrip.  Ben and Mary also agreed to
convey like easements in favor of Lots 2B4, 7B8, and 10B11, Block B at the request of the purchaser upon the sale of any of
those lots in exchange for the payment of $5,000.  In addition, the purchaser of the lots would
receive membership in the Association automatically upon closing.  The Settlement Agreement sets forth a process
by which owners of lots that are not adjacent to the airstrip may purchase
access easements from the Association for $2,000, $1,000 of which would be
payable to Ben and Mary or Athe then owner@ of the
airstrip.  The Settlement Agreement also
provides that A[n]o further
payments shall be due to [Ben and Mary] in connection with the use of the
airstrip or extension thereof or taxiways or access point.@  The Settlement Agreement
concluded by stating that if the Association failed to maintain good standing,
dissolved, terminated, or failed to maintain the lease of the airstrip in good
standing, any lot owners who paid for access easements Ashall continue to have such access, and no further easement,
right-of-way, right or grant shall be necessary to allow them such access.@  













On April 19, 1991, the day
after the date of the agreed judgment, Ben and Mary conveyed the Lot 1 access
easement to the bank.  This document is
recorded in the Denton County real property records.  In the document, Ben and Mary convey Aa nonexclusive easement for aircraft for flight and taxiway purposes
along, over and across@ the
airstrip.  Immediately following the
legal description are the same Asubject to@ conditions
included in the 1985 Lot 5 access easement, including the language imposing a
$200 per year charge payable to the AOwner and/or Manager@ of the airport for Ause of [the] airport.@      In accordance with the Settlement Agreement, the bank
incorporated the Association, and the bank=s representative, as attorney in fact for the Association, entered
into the lease with Ben and Mary as contemplated by the Settlement Agreement.[5]  The lease allowed the Association to Aoccupy and use [the airstrip] as a landing strip for aircraft landing
and takeoff, taxiing, and related purposes@ pursuant to rules and regulations promulgated by the
Association.  The lease term was for ten
years, beginning June 1, 1991 and ending May 31, 2000; it also provided that
the Association could extend the lease for an additional ten years by giving
written notice no later than April 2, 2000. 
The Association agreed to surrender possession of the airstrip to Ben
and Mary upon expiration of the lease term. 
During the lease term, the Association was to be solely responsible for
maintenance of the airstrip.  

Although the Association
entered into the lease with Ben and Mary, it never took possession of the
airstrip pursuant to the lease, it never established rules and regulations for
use of the airstrip, it never made payments to Ben and Mary as provided in the
lease, and it never took over responsibility for maintenance of the airstrip as
provided for in the lease and Settlement Agreement.  Ben and Mary continued to maintain the
airstrip as they had previously.  








Ben and Mary subsequently
conveyed several access easements to third parties who purchased property from
the bank, including some of the lot owners.[6]  All of the easements benefitting the lot
owners= propertiesCexcept those
affecting Lot 1, Block B (one of Smith=s lots) and Lot 5, Block B (Walchshauser=s lot)Cwere
purchased by the lot owners, or their predecessors in ownership, years after
entry of the agreed judgment incorporating the Settlement Agreement.  For example, Smith purchased Lot 4, Block B
from the bank on September 10, 1993; that same day, Ben and Mary conveyed an
easement and right-of-way upon and across the airstrip Afor the use and benefit of@ Lot 4.  That easement, and all
of the other lot owners= easements
except those benefitting Lot 1 and Lot 5 contain the following language, which
is substantially similar to the Asubject to@ language in
the Lot 1 and Lot 5 easements:

SUCH
EASEMENT IS SUBJECT TO THE FOLLOWING:

 

(1)    Rules and regulations as established and
amended from time to time by the property owner=s
association which manages the Ironhead Airport under a Lease Agreement;

 

. . .
.

 

(4)    Grantees shall be subject to the association
dues and restrictions established by the property owner=s
association which manages the Ironhead Airport.

 








(5)    Grantee shall be subject to charge of $200.00 per year for use of
airport; Owner and/or Manager of airport shall have right to increase such
charge at the rate of 10% annually after the year 1985.  Grantee shall pay any such charge within 30
days from date of billing.[7]

The easement also provides that A[i]n the event of any controversy, claim, or dispute relating to this
instrument or the breach thereof, the prevailing parties shall be entitled to
recover from the losing party reasonable expenses, attorneys fees, and costs.@  

On November 15, 1993, Ben and
Mary executed a ratification of the easements benefitting Lots 1 and 5, which
they recorded in the Denton County property records.  The document states that Smith and
Walchshauser were concerned that their purchases from the bank may not have
properly documented Atheir
purchase of the runway user privileges and rights@ and that Atheir
dealings with the Property Owners= Association also may not [have been] properly documented.@  Ben and Mary ratified and
confirmed that Lots 1 and 5 carry with them Athe fully paid and nonassessable right and privilege to use the entire
runways and taxiways as described in the 13.088 acre tract subject only to the
payment of maintenance fees as described in the restrictive covenants.@ 








In December 1993, Ben and
Mary billed the lot owners $200 for A1994 Runway Use and Maintenance Fee@ pursuant to the easement agreements.[8]  The next year, they began escalating the
runway fee by ten percent per year, which escalation continued at the maximum
ten percent per year throughout the litigation. 
Smith paid the fees through the 1999 calendar year; Walchshauser paid
the fees through the 2000 calendar year; and Lyon, Adams, and Putnam paid the
fees through the 2001 calendar year.[9]  None of the lot owners have paid the Hustons
fees pursuant to the easements since the lot owners filed suit against the
Hustons on March 30, 2001, at which time the fee was $389.74 per year.  








The lot owners initially sued
Ben only,[10]
alleging, among other things, claims for promissory estoppel, trespass and
tortious interference, breach of contract, fraud, breach of fiduciary duty, and
appointment of a receiver for the airstrip. 
The lot owners contended that Athe primary issue and dispute@ in the case was the interpretation of the Asubject to@ language in
the easements.  They also alleged that
Ben was arbitrarily interfering with their access rights to the airstrip and
harassing them and their guests.  They
requested both a temporary and permanent injunction and a declaratory judgment
construing the parties= rights with
respect to the runway, including a declaration that any fees charged under the
runway easements must be used for maintenance purposes only, must be only in an
amount that is reasonable and necessary for the actual maintenance of the
runway, and that Ben must provide the lot owners with a detailed accounting of
the fees collected and expended.  On
April 12, 2001, the trial court granted appellants a temporary injunction
pending a final judgment in the case.  

On August 8, 2002, Ben and
Mary conveyed all of their remaining property, except for a couple of acres
upon which their house was located, to their children, Benjamin E. (Ben, Jr.)
and his wife Diana, and Thomas Wessie (Wes) and his wife Cristy.  The conveyance included the airstrip.  After the conveyance, Ben, Jr. and Wes Aassumed management and operational responsibilities for the Ironhead
Airport.@  They continued to bill
easement holders, including the lot owners, for fees in accordance with the
easement agreements, escalating the fees by 10 percent each year. 








The litigation remained
pending for several years.  On June 30,
2006, appellants filed a motion for partial summary judgment, in which they
requested a declaratory judgment on eleven different grounds related to access
and use of the airstrip and payment and assessment of maintenance fees for the
airstrip.  They did not move for summary
judgment on any of their other claims. 
Appellants contended generally (1) that the Settlement AgreementCspecifically the provision prohibiting payments to Ben and Mary in
connection with the easements other than the initial purchase priceCcontrols and binds the parties; (2) that access to the runway is
separate from, and should not be affected by, Aany obligation to pay a maintenance fee or reimburse the owner of the
runway the ad valorem taxes thereon@; (3) that the lease should be re-executed and possession of the
airstrip should be delivered to the Association or, in the alternative, that
the court should order that the Association is the manager of the airstrip; (4)
that any maintenance fees charged to lot owners must be reasonable and
necessary, must be used for maintenance purposes only, must be in an amount
equal to each lot owner=s
proportionate share, and must be kept in a separate account managed by the
Association; and (5) that a fund custodian must deliver an accounting of the fees
to the lot owners.  








Appellees filed traditional
and no-evidence motions for summary judgment, also on June 30, 2006.  Appellees contended that appellants could
produce no evidence supporting their claims for trespass, tortious interference,
breach of contract, and breach of fiduciary duty.[11]  They also sought summary judgment denying
appellants= claims for
declaratory and injunctive relief.  As
affirmative relief, the Hustons claimed that as a matter of law they were
entitled to a judgment against the lot owners for unpaid easement fees, that
they were entitled to declaratory relief establishing the opposite of
appellants= requests
for declaratory relief, and that they were entitled to a declaration that,
according to the plain language of the easements, the lot owners= access to and use of the airport is conditioned upon being current
with all fees due and owing.  Crawford
also moved for summary judgment on all of appellants= claims against her on no-evidence grounds.  








The parties each filed
responses to the others= motions and
supplements to their own motions.  The
trial court heard the competing motions on August 1, 2006.  After carefully considering the motions and
summary judgment evidence, the trial court granted a partial summary judgment
as to all claims except (1) appellants= claim for a permanent injunction and (2) the parties= claims for attorneys= fees and litigation costs,[12]
both of which the trial court reserved for trial.  

The court dismissed all of
appellants= claims
against Crawford; it also denied and dismissed appellants= claims for trespass, tortious interference, breach of contract, and
breach of fiduciary duty.[13]  The trial court found that Ben and Mary were
entitled to a judgment against the lot owners for unpaid fees through 2002,
plus prejudgment interest from March 30, 2001, and that Ben, Diana, Wes, and
Cristy were entitled to a judgment against the lot owners for unpaid fees for
2003 through 2006, plus prejudgment interest from March 30, 2001.

The trial court also rendered
declaratory judgment as follows:

$                  
That the Association Anever functioned in the manner contemplated by the Settlement
Agreement@ and Anever operated or managed the airstrip@; thus, the lease Anever came into effect.@  








$                  
That the Association never
had any authority over the airstrip or its operations; thus, Aauthority and control over the [a]irstrip and its operations remained
in the hands of . . . [Ben and Mary], and their successors in title to the
[a]irstrip.@  

$                  
That the lease cannot and
will not be resurrected as requested by appellants.

$                  
That the lot owners= easements are appurtenant to the title of the lots and run with the
title to the lots.

$                  
That the rights and
privileges of the lot owners pursuant to the easements are independent of the
agreed judgment and Settlement Agreement; thus, the owners of the airstrip Ahave a duty to not interfere with the free access and use of the@ easements, and the owner, or owners, of the easements is obligated to
Arefrain from arbitrary, capricious, or retaliatory airport management
practices, provided, however, all such duties of non-interference are subject
to and are to be applied consistent with concerns for aviation safety.@  

$                  
That Ben, Jr., Diana, Wes,
and Cristy are the current owners of the airstrip.








$                  
That the airstrip easements Acontemplate the operation of a community airstrip for use by light,
general aviation aircraft, excluding Ultralights,@ and, thus, the owners of the airstrip have both the authority and
duty to maintain and supervise the operation of the airstrip consistent with
its contemplated use and prudent airport management policies, to be exercised
in accordance with concerns for aviation safety and without undue or
unnecessary interference with the easement rights of the lot owners.

$                  
That the owners of the
airstrip are entitled to charge fees pursuant to the easements, that the 2006
fee was $599.13, that the owner of the airstrip may invoice the fees on or
after January 1 of each successive year, beginning January 2007, and that the
fees are payable thirty days thereafter.

$                  
That the owner of the
airstrip may increase the fee to the lot owners by 10% for 2007 and by an
additional ten percent each year thereafter Auntil a court of competent jurisdiction concludes by final judgment
that circumstances developing after entry of the final judgment in this case
exist, which would authorize a court to prohibit enforcement of the 10%
escalator.@








$                  
That the easements Aare not subject to forfeiture@ and that the failure of a lot owner to timely pay the easement fee Adoes not authorize the owner(s) . . . to exercise any form of self
help, extra-judicial remedies, including, but not limited to, interference in
any respect with the right of the [lot owners] to use and enjoy the [a]irstrip,
nor does such failure to timely pay permit or authorize any form of
non-judicially declared forfeiture of@ the easements.

$                  
That if a lot owner fails to
timely pay easement fees, the owner of the airstrip Ahas available for the enforcement and collection of such unpaid fees
all normal and customary legal processes for the collection of a debt,
including, but not limited to, the availability of the judicial imposition of a
charging lien or encumbrance against the [lot owners= lot], plus the additional recovery of interest, attorney=s fees and costs as may be found to be appropriately recoverable  in any subsequent litigation by a court of
competent jurisdiction.@

$                  
And that all other claims for
declaratory relief are denied Abecause and for among other reasons, the Court declares that the
amount of Runway Fees are not subject to a reasonableness limitation and that
the owner(s) of the [airstrip] is not obligated to account for the use of
monies received in payment of Runway Fees or to segregate such payments from
other funds.@  

After the trial court
rendered the partial summary judgment, appellants nonsuited their claim for
permanent injunctive relief; the trial court subsequently conducted a bench
trial on the sole issue of whether appellants and appellees were entitled to
recover attorneys= fees and
litigation costs from each other.  








After a three day bench trial
on attorneys= fees, the
trial court issued a final judgment, which incorporated its rulings on the
partial summary judgment.  It also
included its rulings on attorneys= fees, awarding the Hustons attorneys= fees against Smith in the amount of $23,666.66; against Lyon,
Walchshauser, Adams, and the Frankie B. Putnam, Sr. Trust in the amount of
$11,833.33 each;[14]
and against all of the lot owners in favor of the Hustons for conditional fees in
the event of an appeal.  The trial court
further awarded all appellees court costs under rule 131.  Tex.
R. Civ. P. 131.

After rendering final
judgment, in accordance with appellants= request, the trial court entered findings of fact and conclusions of
law in connection with its rulings on costs and attorneys= fees.  However, the court
refused to make any findings of fact and conclusions of law regarding the
issues decided on partial summary judgment. 

Issues Presented








Appellants
bring two issues in which they challenge the correctness of the trial court=s judgment as a matter of law and contend that they were entitled to
judgment as a matter of law.  They group
their arguments into the following categories: 
1) the 362nd District Court=s prior rulings on ownership, control, and maintenance feesCvia the agreed judgment incorporating the Settlement AgreementCprecluded the trial court from relitigating the same issues under
principles of res judicata or collateral estopppel; 2) there is no evidence to
support appellees= breach of
contract, quantum meruit, or common law debt claims; 3) the airstrip easements
are irrelevant and do not control; 4) the lot owners never agreed to pay fees
unrelated to maintenance of the airstrip; 5) any maintenance fees that are
chargeable are owed to the Association and not to the Hustons or their
successors; 6) Ben, Jr., Diana, Wes, and Cristy did not assume any obligation
to maintain the runway when Ben and Mary conveyed the airstrip to them, nor did
they contract with Ben and Mary to do so; 7) FAA regulations provide only for
the imposition of a uniform landing fee, which has never existed; thus, any
maintenance fee should be for the whole subdivision to be assessed by the
Association only; 8) the trial court improperly calculated prejudgment
interest; and 9) the trial court should have made additional findings of fact
and conclusions of law requested by appellants. 
Appellants also contend that if we reverse any substantive rulings in
favor of the Hustons, we should also remand the attorneys= fees part of the judgment to the trial court for a new trial.








In their cross-appeal, the
Hustons contend (1) that the trial court erred by entering a declaratory
judgment that they could not withhold access under the easements if the lot
owners were not current in their payment of fees and (2) that the trial court erred
by awarding attorneys= fees to the
lot owners, which it offset against the fees recovered by the Hustons.

Summary Judgment Standard of
Review

When both parties move for
summary judgment and the trial court grants one motion and denies the other,
the reviewing court should review both parties= summary judgment evidence and determine all questions presented.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).  The reviewing
court should render the judgment that the trial court should have
rendered.  Id.

A plaintiff is entitled to
summary judgment on a cause of action if it conclusively proves all essential
elements of the claim.  See Tex. R. Civ. P. 166a(a), (c); MMP,
Ltd. v. Jones, 710 S.W.2d 59, 60 (Tex. 1986).  A defendant who conclusively negates at least
one essential element of a cause of action is entitled to summary judgment on
that claim.  IHS Cedars Treatment Ctr.
of Desoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004); see
Tex. R. Civ. P. 166a(b), (c).








When reviewing a
summary judgment, we take as true all evidence favorable to the nonmovant, and
we indulge every reasonable inference and resolve any doubts in the nonmovant=s favor.  Mason, 143
S.W.3d at 798.  Questions of law are
appropriate matters for summary judgment. 
Rhone‑Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex.
1999); Westchester Fire Ins. Co. v. Admiral Ins. Co., 152 S.W.3d 172, 178
(Tex. App.CFort Worth
2004, pet. filed) (op. on reh=g).

Findings of Fact and
Conclusions of Law

Appellants contend that they
were entitled to findings of fact and conclusions of law as to all of the trial
court=s rulings, including the rulings in its order granting partial summary
judgment.  The trial court issued
findings of fact and conclusions of law on the only issue that proceeded to
trialCwhether the parties were entitled to attorneys= fees and litigation costs.  The
trial court refused to make findings of fact and conclusions of law on the
issues determined by summary judgment.








When a trial court grants
summary judgment relief, findings of fact have no place in the proceeding
because the summary judgment proceeding has not been Atried@ within the
scope of rule 296, the rule of civil procedure authorizing findings of fact and
conclusions of law.  Linwood v. NCNB
Tex., 885 S.W.2d 102, 103 (Tex. 1994); Homes v. Cull, 173 S.W.3d
565, 575 (Tex. App.CFort Worth
2005, no pet.); see also Tex. R.
Civ. P. 296-98.  The failure to
make such findings is not error and, if made, they are correctly disregarded by
the appellate court.  Cotton v.
Ratholes, Inc., 699 S.W.2d 203, 204 (Tex. 1985). 

Nevertheless, appellants
contend that because the trial court later incorporated its partial summary
judgment rulings into a final judgment, part of which included rulings made by
the trial court after a partial trial on the merits, it is now unclear whether
the summary judgment rulings are now to be Aregarded as resulting from a full trial.@  But appellants have provided
us with no authority supporting this contention, nor have we found any.  See, e.g., Pantaze v. Yudin, 229
S.W.3d 548, 550-51 (Tex. App.CDallas 2007, pet. dism=d w.o.j.) (reviewing partial summary judgment incorporated into final
judgment under applicable summary judgment standard of review).  Thus, we conclude and hold that appellants
were not entitled to any additional findings of fact and conclusions of law in
this case, and the trial court did not err by refusing to make the additional
ones requested by appellants.  Cf.
Main Place Custom Homes, Inc. v. Honaker, 192 S.W.3d 604, 612 (Tex. App.CFort Worth 2006, pet. denied) (AIf the refusal to file additional findings does not prevent a party
from adequately presenting an argument on appeal, there is no reversible error.@).

No
Evidence on Breach of Contract, Quantum Meruit,








or
Common Law Debt Claims

 

Appellants contend that the
Hustons abandoned their claims for breach of contract, quantum meruit, and
common law debt and that, consequently, there are no pled theories supporting
the part of the trial court=s final judgment awarding the Hustons damages in the amount of the
unpaid fees.  The Hustons contend that
the contracts upon which their claims were based are the runway easements that
they granted to the lot owners.  

In appellees= First Amended Answer to Plaintiff=s Fourth Amended Original Petition, Counterclaim, and Third Party
PetitionCappellees= latest
pleading on file before the trial court granted partial summary judgmentCappellees stated that they Aseek and are entitled to recover unpaid fees related to the runway
easements from@ appellants,
under the heading, AClaimBBreach of Contract/Suit for Unpaid Fees/Quantum Meruit.@  In their motion for summary
judgment, they stated that they are entitled to Aunpaid fees plainly due and owing pursuant to written instruments
authorizing [the lot owners=] use of the airports [sic].@  It is clear from appellees= pleadings and their motion for summary judgment that they were
seeking damages for the lot owners= failure to pay  fees in
accordance with the runway easements and the Asubject to@ language
that was included in each one.








Appellants allege that the Asubject to@ language in
the easements is no evidence that the lot owners have an obligation to pay such
fees.  Specifically, they contend that
the language is ambiguous and can be interpreted in more than one reasonable
way.  For instance, they contend that the
easements could be construed to require Aeach lot owner . . . to pick up his/her fair share of the cost of
maintaining@ the
airstrip.  

Applicable Law

The rules of contract
construction govern the interpretation of easements.  Marcus Cable Assocs., L.P. v. Krohn,
90 S.W.3d 697, 700 (Tex. 2002); DeWitt County Elec. Coop., Inc. v. Parks,
1 S.W.3d 96, 100 (Tex. 1999); Hubert v. Davis, 170 S.W.3d 706, 711 (Tex.
App.CTyler 2005, no pet.).  Courts
must examine the easement as a whole in light of the circumstances present when
the parties entered the agreement.  DeWitt,
1 S.W.3d at 101; Koelsch v. Indus. Gas Supply Corp., 132 S.W.3d 494,
497-98 (Tex. App.CHouston [1st
Dist.] 2004, pet. denied).








The contracting parties= intentions, as expressed in the easement grant, determine the scope
of the conveyed interest.  Marcus
Cable, 90 S.W.3d at 700-01; DeWitt, 1 S.W.3d at 103; Koelsch,
132 S.W.3d at 497-98.  Unless the
language is ambiguous, we rely solely on the written instrument.  Koelsch, 132 S.W.3d at 498.  Like a contract, an easement is unambiguous
as a matter of law if it can be given a definite or certain legal meaning.  Hubert, 170 S.W.3d at 711; see J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003); Heil Co. v.
Polar Corp., 191 S.W.3d 805, 810 (Tex. App.CFort Worth 2006, pet. denied). 
On the other hand, if an easement is susceptible to more than one
reasonable interpretation, it is ambiguous. 
Hubert, 170 S.W.3d at 711; see Coker v. Coker, 650 S.W.2d
391, 393 (Tex. 1983); Heil, 191 S.W.3d at 810.








Words used in an unambiguous
contract are given their plain and ordinary meanings unless the instrument
shows that the parties used the words in a technical or different sense.  Heil, 191 S.W.3d at 810.  We assume that the parties intend for every
clause to have some effect.  Koelsch,
132 S.W.3d at 498; Eastman Software, Inc. v. Tex. Comm. Bank, N.A., 28
S.W.3d 79, 85 (Tex. App.CTexarkana
2000, pet. denied); see also NP Anderson Cotton Exchange, L.P. v. Potter,
230 S.W.3d 457, 463 (Tex. App.CFort Worth 2007, no pet.) (construing lease).  When the provisions of a contract appear to
conflict, we harmonize them, if possible, to reflect the intentions of the
parties.  Ogden v. Dickinson State Bank,
662 S.W.2d 330, 332 (Tex. 1983); Koelsch, 132 S.W.3d at 498.  To achieve this objective, we examine and
consider the entire contract to harmonize and give effect to all its
provisions, so that none will be rendered meaningless.  NP Anderson, 230 S.W.3d at 463; Koelsch,
132 S.W.3d at 498.

We review the trial court=s interpretation of an easement de novo.  Hubert, 170 S.W.3d at 711; Air Park‑Dallas
Zoning Comm. v. Crow‑Billingsley Airpark, Ltd., 109 S.W.3d 900, 909 (Tex.
App.CDallas 2003, no pet.).  

A grantee of property rights
who accepts delivery of a conveyance is bound by the conditions and obligations
contained within the conveying instrument regardless of whether the grantee
actually signs the conveyance instrument. 
See Greene v. White, 153 S.W.2d 575, 583 (Tex. 1941); Panhandle
Baptist Found., Inc. v. Clodfelter, 54 S.W.3d 66, 72 (Tex. App.CAmarillo 2001, no pet.) (applying rule to easement); Rutten v.
Cazey, 734 S.W.2d 752, 755 (Tex. App.CWaco 1987, writ denied) (same). 
The recording of a conveyance creates a presumption of acceptance.  Panhandle Baptist Found., 54 S.W.3d at
71-2.








With respect to a conveyance
of an interest in real property, the term Asubject to@ is a term
of qualification, meaning Asubordinate to,@ Asubservient to,@ or Alimited by.@  EOG Res., Inc. v. Hanson Prod. Co., 94
S.W.3d 697, 702 n.2 (Tex. App.CSan Antonio 2002, no pet.); Bradshaw v. Lower Colo. River Auth.,
573 S.W.2d 880, 883 (Tex. Civ. App.CBeaumont 1978, no writ); Kokernot v. Caldwell, 231 S.W.2d 528,
531 (Tex. Civ. App.CDallas 1950,
writ ref=d).  Because Asubject to@ language implies
a limitation, it should not be interpreted to give a grantee rights in addition
to an already stated scope of conveyance. 
Rather, an easement that is granted Asubject to@ certain
conditionsCincluding
conditions requiring performance by the granteeCis burdened by those conditions. 
See Rutten, 734 S.W.2d at 755 (holding that easement grantee was
required to build and maintain fence over easement when easement grant was
expressly made subject to affirmative obligation of grantee to build and
maintain fence); see also Kuo v. Greenview Townhomes Ass=n, Inc., No. B14-88-00066-CV, 1989
WL 6925, at *1B2 (Tex. App.CHouston [14th Dist.] Feb. 2, 1989, no writ) (not designated for
publication) (holding, in accordance with cases construing Asubject to@ language as
language of limitation, that grantee of deed made subject to Amaintenance charges not now due and the leans [sic] securing said
charges@ was personally liable for payment of such maintenance charges).

Analysis

The trial court concluded
that the owner of the airstrip is entitled to charge the fee set forth in the
easements, that the owner may increase the fee by ten percent each year as
provided for in the easements, that the fees are not subject to a
reasonableness limitation, and that the owner is not obligated to account for
or segregate any payments for the fees from other funds. 








The easements are not
ambiguous; thus, we rely solely on the easements themselves to interpret their
meaning.  Each easement, on its face,
clearly provides that the owner of the lot, and his or her successors or
assigns, is entitled to nonexclusive use of the airstrip for flight and taxiway
purposes.  Immediately following the
granting language and the property description, the easement states that the
grant is subject to certain enumerated conditions regarding use of the
airstrip.  Thus, the discernable intent
of the parties is that use of the airstrip is to be in compliance with the
enumerated terms and conditions.








Within these terms and
conditions, the language establishing the charge Afor use of airport@ is likewise not ambiguous.  It
includes an affirmative obligation of grantee: 
AGrantee shall pay any such charge within 30 days from date of billing.@  It also sets a floor for the
fee amount, $200 per year, and provides that either the owner or the manager of
the airstrip can increase the fee by no more than ten percent each year.  This is a definite formula that is easily
determinable based on fees charged for the prior year.  Nothing in this language provides that the
fee must be reasonable or that the owner or manager of the airstrip must
provide an accounting of the fees, segregate payments for the fees from any
other funds, or use the fees for any particular purpose.  Appellants have not pointed to any statute or
case law that would compel a contrary conclusion in light of the express intent
of the language in the easements.

Although the Asubject to@ language in
the easements shows an intent for a property owners= association to manage the airstrip under a lease agreement, the fee
language contemplates payments to either the owner of the airstrip or the
manager; this shows an intent that the airstrip might not always be managed by
a property owners= association
and, in the absence of a separate manager, that fees may be collected by the
owner.

Appellants contend that the
trial court=s
construction of the easements does not make sense, especially in light of the
trial court=s conclusion
that the amount of the fees, if escalated the full ten percent each year, would
eventually exceed the value of the lots themselves.  But the trial court recognized that although
such a situation was a future possibility, it had not yet occurred.  An easement granted for a particular purpose
terminates when its purpose is rendered impossible of performance, not before.  See Jones v. Fuller, 856 S.W.2d 597,
603 (Tex. App.CWaco 1993,
writ denied).  The mere possibility that
performance in the future may be affected by the lockstep use of the escalation
clause in the easements does not mean that the unambiguous nature of the fee language
can be ignored in determining the present status of the easement.








Accordingly, we hold that the
easement language is not ambiguous and that the trial court properly construed
the fee language.

As part of their no-evidence
arguments, appellants also contend that the Settlement Agreement prohibits
appellees from charging the fees expressly set forth in the easements.  We will examine that contention together with
appellants= contention
that the Settlement Agreement has a judicially preclusive effect as to the
easements.

Settlement Agreement
Pre-emption

Appellants contend that the
agreed judgment in the 362nd District Court incorporating the Settlement
Agreement prohibits the Hustons from charging and collecting any fees for use
of the airstrip, including the fees set forth in the easement agreements.

Applicable Law








As with easements, agreed
judgments should be construed in the same manner as contracts.  Gulf Ins. Co. v. Burns Motors, Inc.,
22 S.W.3d 417, 422 (Tex. 2000); Ferguson v. Ferguson, 111 S.W.3d 589,
594 (Tex. App.CFort Worth
2003, pet. denied).  Thus, we begin with
an examination of the language of the Settlement Agreement, which is the basis
of the agreed judgment.  See Columbia
Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 588 (Tex.
1996); Ferguson, 111 S.W.3d at 592. 
We also look to the other documents entered into by the parties as part
of the same transaction; here, those documents are the lease and the easement
to the bank for Lot 1, Block B.  DeWitt,
1 S.W.3d at 101-02; see NP Anderson, 230 S.W.3d at 463.

Res judicata applies to an
agreed judgment.  St. Raphael Med.
Clinic, Inc. v. Mint Med. Physician Staffing, L.P., No. 01-06-00983-CV,
2007 WL 3105811, at *3 (Tex. App.CHouston [1st Dist.] Oct. 25, 2007, no pet.); Jistel v. Tiffany
Trail Owners Ass=n, 215 S.W.3d 474, 480 (Tex. App.CEastland 2006, no pet.).  The
doctrine of res judicata in Texas holds that a final judgment in an action bars
the parties and their privies from bringing a second suit Anot only on matters actually litigated, but also on causes of action
or defenses which arise out of the same subject matter and which might have
been litigated in the first suit.@  Compania Financiara Libano,
S.A. v. Simmons, 53 S.W.3d 365, 367 (Tex. 2001); Barr v. Resolution
Trust Corp., 837 S.W.2d 627, 630 (Tex. 1992).








The doctrine of collateral
estoppel also precludes the relitigation of issues.  See Sysco Food Servs., Inc. v. Trapnell,
890 S.W.2d 796, 801 (Tex. 1994); Fort Worth Hotel Ltd. P=ship v. Enserch Corp., 977
S.W.2d 746, 753 (Tex. App.CFort Worth 1998, no pet.) (op. on reh=g).  A party seeking to assert
the bar of collateral estoppel must establish that (1) the facts sought to be
litigated in the second action were fully and fairly litigated in the first
action, (2) those facts were essential to the judgment in the first action, and
(3) the parties were cast as adversaries in the first action.  Sysco Food Servs., 890 S.W.2d at 801; Fort
Worth Hotel, 977 S.W.2d at 753.

 

 

Analysis

The language in the
Settlement Agreement that appellants contend governs the issues in this case
appears immediately after the paragraph that obligates the owners of the
airstrip, at that time Ben and Mary, to execute access easements in exchange
for one time cash payments.  The
Settlement Agreement then states, ANo further payments shall be due to Huston in connection with the use
of the airstrip . . . or taxiways or access point.@








Although this language in the
Settlement Agreement appears to provide that the Hustons would not be entitled
to any further payments for the easements, the easement to the bank, executed
as part of the same transaction, included the same Asubject to@ fee
language, obligating the grantee to pay an annual fee Afor use of airport.@  These two provisions appear at
first to conflict, but an examination of all the documents executed in
connection with the Settlement Agreement and agreed judgment reveals the
parties= intentions regarding the management and operation of the airstrip and
the access thereto.








The Settlement Agreement
recitations recognize Ben and Mary=s roles as initial developers of the property and describe the deed in
lieu of foreclosure and subsequent dispute between Ben and Mary and the
bank.  When viewed as a whole, with the
lease and easement to the bank, it is clear that the overall development scheme
contemplated by the Settlement Agreement was that the Association would manage
and be responsible for maintaining the airstrip for the benefit of the owners
of lots within the subdivision only during the lease term, as that term could
be extended.  The lease itself provided
that upon termination, the Association would surrender possession of the airstrip.  Moreover, the Settlement Agreement itself
provided for the possibility that the Association would not be organized, or
having been organized would cease to function; the Settlement Agreement makes
it clear that in that event access to the airstrip is not affected.  Thus, the intent of the parties that can be
ascertained from these documents is that upon either (1) expiration of the
lease, whether after the initial ten years or after the renewal term, if exercised,
or (2) failure or inability of the Association to assume its rights and duties
as contemplated by the Settlement Agreement, responsibility for managing,
operating, and maintaining the airstrip would remain with the owners of the
airstrip, who would nevertheless continue to provide access to the adjoining
lot owners.

The lot owners accepted their
easement agreements pursuant to the Asubject to@ fee
language.  All of those easements were
either conveyed or ratified after the Settlement Agreement.  Although the Settlement Agreement states that
no further payments shall be due to Ben and Mary in connection with use of the
airstrip, nothing in the Settlement Agreement prohibits third parties
from contracting otherwise.  Nothing in
the record indicates that the lot owners who received their easements directly
from Ben and Mary objected to the fee language; instead, it shows that they
initially paid the fees, some for several years.  And the lot owners who did not receive their
easements directly from Ben and Mary purchased their lots subject to the
already existing easements.

Thus, we hold that the trial
court=s judgment allowing the Hustons to recover fees from the lot owners
was consistent with the proper construction of the agreed judgment and
Settlement Agreement and, thus, that the Hustons= claims against the lot owners are not barred under principles of res
judicata or collateral estoppel.








Appellants also contend that
Smith=s attempt to reinstate the Association was valid and that as a result
the Association should be allowed to assume Aits rights of management@ and dismiss the Hustons from the obligations they have assumed to
maintain the airstrip.  But as we have
stated above, the Settlement Agreement contemplates that the Association will
manage the airstrip only so long as the lease is effective.  The initial ten year term of the lease
expired May 31, 2000; to renew the lease for an additional ten years, the
Association had to give the owner of the airstrip written notice no later than
April 2, 2000.  Even if the Association
has been validly reinstated, it cannot go back and renew the lease; the time to
do so has passed.  The Hustons= current operation and management of the airstrip, post-termination of
the lease with the Association, is consistent with the intent of the parties as
expressed in the Settlement Agreement. 
Thus, it is irrelevant to the access and fee validity issues whether the
Association was validly reinstated.








The lot owners also contend
that because the airport is a general aviation (public) airport under FAA
regulations, anyone can use the facilities, subject only to a uniform landing
fee, which does not exist and has never existed.  Appellants did not make this argument in
their motion for partial summary judgment, nor did they raise it in their
response to appellees= motion for
summary judgment.  Thus, we cannot
consider it.  Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 204 (Tex. 2002); Sci. Spectrum, Inc. v.
Martinez, 941 S.W.2d 910, 912 (Tex. 1997); Vawter v. Garvey, 786
S.W.2d 263, 264 (Tex. 1990).  

We conclude and hold that the
trial court=s summary
judgment rulings regarding the easement fees were not incorrect as a matter of
law and that appellants did not prove their entitlement to judgment as a matter
of law on those grounds.

Prejudgment Interest

The lot
owners also contend that the trial court incorrectly calculated prejudgment
interest on the damage awards to the Hustons. 
According to appellants, the trial court should have calculated
prejudgment interest under section 302.002 of the Texas Finance Code rather
than under common law principles.  Tex. Fin. Code Ann. ' 302.002 (Vernon 2006).








Prejudgment interest is Acompensation allowed by law as additional damages for lost use of the
money due as damages during the lapse of time between the accrual of the claim
and the date of judgment.@  Johnson & Higgins  of Tex., Inc. v. Kenneco Energy, Inc.,
962 S.W.2d 507, 528 (Tex. 1998); Pringle v. Moon, 158 S.W.3d 607, 611
(Tex. App.CFort Worth
2005, no pet.).   There are two legal
sources for an award of prejudgment interest: 
(1) general principles of equity and (2) an enabling statute.  Johnson & Higgins, 962 S.W.2d at
528.  Prejudgment interest awarded under
common law should conform to the statutory accrual and compounding formulas
applicable to suits for wrongful death, personal injury, and property
damages.  Id. at 530‑32; De
la Garza v. De la Garza, 185 S.W.3d 924, 928 (Tex. App.CDallas 2006, no pet.).  Under
that statutory accrual formula, prejudgment interest begins to accrue Aon the earlier of the 180th day after the date the defendant receives
written notice of a claim or the date the suit is filed.@  Tex. Fin. Code Ann. ' 304.104 (Vernon 2006); De la Garza, 185 S.W.3d at 928; see
Johnson & Higgins, 962 S.W.2d at 531 (applying former version of
section 304.104).

Section 302.002 of the
finance code provides as follows:

If a creditor has not agreed with an obligor to
charge the obligor any interest, the creditor may charge and receive from the
obligor legal interest at the rate of six percent a year on the principal
amount of the credit extended beginning on the 30th day after the date on which
the amount is due.  If an obligor has
agreed to pay to a creditor any compensation that constitutes interest, the
obligor is considered to have agreed on the rate produced by the amount of that
interest, regardless of whether that rate is stated in the agreement.

 








Tex. Fin. Code Ann. '
302.002.  The finance code defines a Acreditor@ as Aa person who loans money or otherwise extends credit.  The term does not include a judgment
creditor.@  Id. ' 301.002(a)(3).  A Aloan@ is defined
as Aan advance of money that is made to or on behalf of an obligor, the
principal amount of which the obligor has an obligation to the pay the
creditor.  The term does not include a
judgment.@  Id. ' 301.002(a)(10).  An obligor is A a person to whom money is loaned or credit is otherwise
extended.  The term does not include . .
. a judgment debtor.@  Id. ' 301.002(a)(13).  A judgment
creditor is Aa person to
whom a money judgment is payable,@ and a judgment debtor is Aa person obligated to pay a money judgment.@  Id. ' 301.002(a)(5), (6).

The lot owners= obligation to pay easement fees did not involve an extension of
credit; rather, the obligation requires them to pay annual fees for the
easements in advance.  Thus, the Hustons
are not Acreditors@ for
purposes of section 302.002, and the lot owners are not Aobligors.@  See id. ' 301.002(a)(3), (13); De la Garza, 185 S.W.3d at 928.  Accordingly, the calculation of prejudgment
interest under section 302.002 does not apply to the Hustons= judgment against the lot owners for fees.  Appellants do not explain how the trial court
may have improperly calculated prejudgment interest pursuant to common law
principles in the event they apply. 
Thus, we hold that the trial court did not err in its calculation of
prejudgment interest.

We overrule both of
appellants= issues.

The Hustons= Cross-Appeal








 In two issues, the Hustons contend (1) that
the trial court erred by entering a declaratory judgment that they are not
entitled to condition the lot owners= use of the airstrip upon their timely paying the easement fees and
(2) that the trial court should not have awarded any attorneys= fees to the lot owners pursuant to the Declaratory Judgments Act[15].

 

                                       Self-Help
Remedies 

The Hustons contend that the
language in the easements unambiguously provides that the lot owners= use of the airstrip is conditioned upon their timely payment of the
annual fees such that Athe Hustons
should have the right to deny use of the runway to any easement holder who is
in arrears in paying those fees.@ 

Texas law has stated that Asubject to@ language is
a term of qualification and limits the estate granted.  Hawkins v. Ehler, 100 S.W.3d 534, 548
(Tex. App.CFort Worth
2003, no pet.).  However, an easement is
not forfeited by a grantee=s failure to abide by its terms and conditions.  See Hoak v. Ferguson, 255 S.W.2d 258,
261 (Tex. App.CFort Worth
1953, writ ref=d n.r.e.).








The Hustons contend that they
are not seeking to have the easements forfeited, only that they be allowed
(without prior judicial intervention) to suspend the lot owners= right to access pursuant to the easements while any fees remain
unpaid.  According to the Hustons, the
effect of the Asubject to@ language is to limit the lot owners= right to exercise their access rights under the easements to those
times when they are in compliance with all of the Asubject to@ conditions.

Under general easement law,
the owner of the dominant estate (here, the lot owners) has a duty to maintain
the easement, and the owner of the servient estate (here, the Hustons) has no
right to interfere with the rights of the dominant estate to the easement.  Reyna v. Ayco Dev. Corp., 788 S.W.2d
722, 724 (Tex. App.CAustin 1990,
writ denied); see also West v. Giesen, 242 S.W. 312, 320B21 (Tex. Civ. App.CAustin 1922, writ ref=d) (AThe owner of
land which is subject to an easement requiring the maintenance of means for its
enjoyment is not bound, unless by virtue of some agreement, to keep such means
in repair, or to be at any expense to maintain them in a proper condition.@).  The Asubject to@ language,
then, merely limits the scope of the general rights granted with an easement;
in other words, by including Asubject to@ language in
an easement, the parties show an intent to limit the normal rights and duties
attendant with the grant of an easement.








Here, the language in the
easements indicates the parties= intent to limit unrestricted access to the easement area; access is
to be in accordance with airport rules and regulations, and it does not include
the right to park aircraft or other personal property, or to construct real
property, on the easement.  However,
nothing in the easements addresses remedies available to the owner of the
servient estate (the Hustons) in the event any lot owner fails to pay the
easement fees, nor do the easements indicate that the owner of the servient
estate has the right to deny the already limited access completely while fees
are unpaid.  Furthermore, this
interpretation of the easements is consistent with the Settlement Agreement,
the lease, and the easement to the bank for Lot 1, Block B, all of which were
part of the same transaction; those documents make it clear that, contrary to
general easement law, the owners of the servient estate were to be responsible
for managing and maintaining the easements in the absence of an Association,
that the lot owners= access to
the airstrip was to be limited by the operation of applicable covenants,
conditions, and restrictions governing use of the airstrip, but also that their
already limited access was not to be further impaired by the owners of the
servient estate.








The two cases cited by the
Hustons, Kuo v. Greenview Townhomes Ass=n, Inc. and EOG Resources, Inc.
v. Hanson Production Co., while supporting appellees= contention that by accepting the easements, the lot owners accepted
the obligation to the pay the fees as set forth therein, do not stand for the
proposition that appellees can, without judicial intervention, withhold the lot
owners= access to the airstrip when fees are unpaid.  EOG Res., 94 S.W.3d at 702 (employing
principles of contract construction in holding that language in assignment
stating that it was Asubject to@ letter agreement meant that assignment incorporated terms of letter
agreement); Kuo, 1989 WL 6925, at *1 (holding that property owners= association was entitled to judgment against tenant for maintenance
fees).

We conclude and hold that the
trial court did not err by determining that the Hustons may not withhold access
to the airstrip if the lot owners are delinquent in paying fees.  We overrule the second issue in the Hustons= cross-appeal.

Award of Attorneys= Fees to Appellants

In the first
issue in their cross-appeal, the Hustons contend that the trial court abused
its discretion by awarding attorneys= fees to appellants under the Declaratory Judgments Act and offsetting
those fees against the fees it awarded to the Hustons under section 38.001 of
the civil practice and remedies code.








The grant or denial of attorney
fees in a declaratory judgment action lies within the discretion of the trial
court, and its judgment will not be reversed on appeal absent a clear showing
that it abused its discretion.  Oake
v. Collin County, 692 S.W.2d 454, 455 (Tex. 1985); NP Anderson, 230
S.W.3d at 466.  Under the Declaratory
Judgments Act, a court Amay award
costs and reasonable and necessary attorney=s fees as are equitable and just.@  Tex. Civ. Prac. & Rem. Code Ann. ' 37.009; NP Anderson, 230 S.W.3d at 466; Cotten v.
Weatherford BancShares, Inc., 187 S.W.3d 687, 709 (Tex. App.CFort Worth 2006, pet. denied).  AThe statute . . . affords the trial court a measure of discretion in
deciding whether to award attorney=s fees or not@ and places
few restrictions on this discretion.  Bocquet
v. Herring, 972 S.W.2d 19, 20‑21 (Tex. 1998); NP Anderson, 230
S.W.3d at 466.  Reasonableness and
necessity are fact questions; the equity and justice of the fee award are left
to the trial court=s
discretion.  Ridge Oil Co. v. Guinn
Invs., Inc., 148 S.W.3d 143, 161 (Tex. 2004); Bocquet, 972 S.W.2d at
21; NP Anderson, 230 S.W.3d at 466.








A[T]he award
of attorney=s fees in
declaratory judgment actions is clearly within the trial court=s discretion and is not dependent on a finding that a party >substantially prevailed.=@  Barshop v. Medina County
Underground Conservation Dist., 925 S.W.2d 618, 637 (Tex. 1996).  A party need not recover damages or even seek
affirmative relief to be awarded attorneys= fees under the Declaratory Judgments Act, as long as the award of
fees is equitable and just.  Hong Kong
Dev., Inc. v. Nguyen, 229 S.W.3d 415, 452 (Tex. App.CHouston [1st Dist.] 2007, no pet.); Save Our Springs Alliance, Inc.
v. Lazy Nine Mun. Util. Dist. ex rel. Bd. of Dirs., 198 S.W.3d 300, 318
(Tex. App.CTexarkana
2006, pet. denied);  Del Valle ISD v.
Lopez, 863 S.W.2d 507, 512‑13 (Tex. App.CAustin 1993, writ denied).

The Hustons contend that the
trial court=s award of
attorneys= fees to the
lot owners was not equitable and just. 
They claim that the primary consideration in determining whether an
award of fees is equitable and just is the identity of the prevailing party.[16]  According to the Hustons, not only should
they have been the sole prevailing party because they should have prevailed on
their contention that they could restrict the lot owners= access to the airstrip while fees remained unpaid, but also becauseCeven if we overruled their issue as to accessCthey prevailed on the majority of their claims while the lot owners
prevailed on only one of their claims, which was ancillary to the main issues
in the case.  Accordingly, the Hustons
challenge not only the award of attorneys= fees to the lot owners, but the amount as well.








Although the Hustons contend
that the most important issue in the suit was whether and on what conditions
the lot owners were required to pay fees under the easements, the lot owners= ability to access the airstrip was also a subject of much of the
litigation.  The lot owners obtained a
temporary injunction preserving their right to access the airstrip during the
litigation, and much of their motion for summary judgment was devoted to
attempting to prove their entitlement to a permanent injunction.  Although the trial court reserved the lot
owners= claim for a permanent injunction for trial, they voluntarily
nonsuited the claim, presumably in light of the trial court=s ruling in their favor on the access issue.

We conclude and hold that the
trial court did not abuse its discretion by determining that the lot owners
should be awarded, in the words of the Hustons, Ajust less than one-third@ of the fees they attributed to the declaratory judgment part of the
case.  The trial court was within its
discretion to determine that the access issue was a vital part of the relief
sought by the lot owners and that they were entitled to recover fees related to
their work on that aspect of the case.

We overrule the first issue
in the Hustons=
cross-appeal.

 

 








 

 

 

 

Conclusion

Having overruled both of
appellants= issues and
the two issues in the Hustons= cross-appeal, we affirm the trial court=s judgment.

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

 

DELIVERED:
March 20, 2008











[1]Although
appellants named Diane Crawford as an appellee in their docketing statement,
they do not challenge the part of the trial court=s
judgment dismissing their claims against her; the trial court did not enter any
other judgment with respect to Crawford.





[2]This
complaint is contingent upon our disposition of appellants=
issue relating to breach of contract damages. 






[3]Membership
in the Association was to be limited to owners of land in or adjacent to Clear
Creek Air Estates. 





[4]A
copy of this maintenance agreement is not included in the appellate record, and
there is no evidence regarding the date of its commencement or expiration.





[5]Texas
Secretary of State records show that the articles of incorporation for the
Association were dated April 17, 1991. 
The lease is dated the same day as the Settlement Agreement, April 18,
1991, and is recorded in the Denton County property records.  Thus, we consider the Settlement Agreement,
the Lot 1 easement, the formation of the Association, and the lease as part of
one transaction.  DeWitt County Elec.
Coop., Inc. v. Parks, 1 S.W.3d 96, 102 (Tex. 1999). 





[6]Putnam
and Adams purchased easements from Ben and Mary in accordance with the
procedures set forth in the Settlement Agreement.  Lyon and Walchshauser purchased their lots
subject to easements that Ben and Mary had already conveyed to previous
owners.  The easement benefitting Lyon=s lot
was  purchased in accordance with the
Settlement Agreement procedures.  The
easement benefitting Walchshauser=s lot was among the first Ben
and Mary conveyed, six years before execution of the Settlement Agreement;
however, the deed conveying Lot 5 to Walchshauser, which is dated September 15,
1993, two years after execution of the Settlement Agreement, includes verbatim
the Asubject
to@
language set forth in Ben and Mary=s original easement grant
benefitting Lot 5.  Smith, who owns Lot 1
and Lot 4, purchased the easement for Block 4 from Ben and Mary in accordance
with the Settlement Agreement procedures. 
When Smith purchased Lot 1 in 1998, it was already subject to the easement
the bank had purchased from Ben and Mary pursuant to the Settlement Agreement.





[7]The
second and third conditions are exactly the same as those in the Lot 1 and Lot
5 easements.





[8]Ben
states in an affidavit presented as summary judgment evidence that he Abegan@
billing pursuant to the runway easements after the Association=s
failure to perform under the lease. 
Thus, the record shows that the first year for which Ben and Mary
charged fees in accordance with the easement agreements was 1994. 





[9]Ben
sent invoices for fees applicable to each calendar year at the beginning of
that year demanding payment for each calendar year in advance. 





[10]Appellants
added Mary, Ben, Jr., Diana, Wes, Cristy, and Diane Crawford, Ben and Mary=s
daughter, as defendants in their First Amended Original Petition.  





[11]Appellants
abandoned their claims for fraud and appointment of a receiver.





[12]Crawford
did not plead for the recovery of attorneys= fees.





[13]Appellants
have not challenged these rulings on appeal.





[14]The
trial court calculated the amount of fees awarded to the Hustons in the final
judgment by offsetting the total fees it determined were recoverable by the
Hustons by the total fees it determined were recoverable by the lot owners.





[15]In
their cross-appeal brief, the Hustons address the attorney=s
fees issue as their first issue and the self-help issue as their second.  We address their issues out of order for
clarity of discussion.  





[16]The
Hustons contend that A[t]he
one princip[le] plainly established in [this court=s
opinion in] Cotton v. Weatherford Bancshares, Inc. is the idea that a
driving force directing the exercise of discretion to award fees under the DJA
is the identification of the prevailing party.@  However, this court=s
discussion in Cotten was in the context of explaining why a trial court=s
award of attorneys= fees
to a party who had prevailed on some but not all of his issues was not an abuse
of discretion.  187 S.W.3d at
709-10.  We did not rely on such
reasoning to reverse a trial court=s award of attorneys= fees
to a party who prevailed on at least one of its affirmative issues.  See id.